PEOPLES NATIONAL BANK OF LITTLE ROCK *v.*
LINEBARGER CONSTRUCTION COMPANY.

4-9435                                         240 S. W. 2d 12

Opinion delivered May 28, 1951.

Rehearing denied July 2, 1951.

*Donham, Fulk & Mehaffy,* for appellant.

*William M. Moorhead, E. Charles Eichenbaum* and
*A. F. House,* for appellee.

ED. F. McFADDIN, Justice. The trial court refused to
allow appellant any recovery for money which it had
advanced to Floyd Cart in reliance on appellees' repre-
sentations to appellant.

The appellee, Linebarger Construction Company
(hereinafter called "Linebarger"), was a partnership
composed of W. E. and Richard W. Linebarger, and was
the principal contractor for building the Rivercliff Apart-
ments in Little Rock. Linebarger subcontracted to Floyd

Cart the furnishing of labor—but not materials—for the plastering work in the said buildings. The subcontract was based on unit prices; and, through error of Linebarger, the original total of Cart's subcontract was placed at $62,551.70 for which he made surety performance bond to Linebarger. The correct total afterwards proved to be only $50,884.30.[1]

The Linebarger-Cart contract was dated February 18, 1948, and stated that Cart was to be paid on *monthly* estimates. But his laborers demanded payment each week; and Cart was unable to finance these payments from one month to the next. Accordingly, he asked Linebarger to pay him each week. This request was refused, but Linebarger suggested that Cart might get some bank to finance him from one monthly payment to the next. Linebarger learned from Cart that he carried an account with the appellant, Peoples National Bank (hereinafter called "Peoples" or "Bank"); and Linebarger then called the Peoples Bank and outlined the situation to Mr. Hadfield, one of its officials. Hadfield gave the following undenied version of the conversation:

"Mr. Linebarger called me by telephone. He told me that he had let a sub-contract for the plastering on the Rivercliff Apartments to Mr. Floyd D. Cart and that Mr. Cart would need money for his payroll from month to month and that he could only pay him once a month on his estimate and wanted to know if my bank would be interested in financing this payroll. I asked him how much money it would involve and I believe he told me the contract ran into some sixty thousand dollars total, but he would only want payroll money from month to

---

[1] The Linebarger-Cart contract contained these provisions: "It is further understood and agreed that the quantities set forth above are of close approximations only, and that the unit prices govern, with the quantities being adjusted to those actually developed in the job, and that the final gross consideration is to be the sum of the actual quantities at the unit prices set forth herein. . . . It is further agreed and understood that such partial or monthly payments shall only be made for 90% of the work performed, the remaining 10% being retained until the completion of the work and final payment under general contract conditions and then added to, and made a part of, the final or completion payment."

Another case in this Court growing out of the Linebarger-Cart contract is that of *Western Casualty Co.* v. *Linebarger*, No. 9434, post, p. 48, 239 S. W. 2d 753 (opinion delivered May 21, 1951).

month. He says, 'You will be taking no chances, however, on that; I will have an assignment drawn in my office of the contract in favor of your bank; I will give you a letter each month telling you how much money he will have coming to him from the next estimate so you will know how much money to lend him.' "

Linebarger prepared and had Cart execute an assignment from Cart to the Bank, and Linebarger executed the acceptance of the assignment, and gave Cart the completed instrument,[2] along with a signed letter from Linebarger to the Bank, dated May 21st, and reading:

"Confirming Mr. Linebarger's conversation with you, we enclose herewith Assignment of monies to be paid to Floyd D. Cart, Plaster Contractor, on his contract with us for work to be done on the Rivercliff Apartments. This Assignment has been duly completed by this company and it is our understanding that Mr. Cart will call at the bank in the morning to complete the transaction.

"By June 10 an amount near $6,000 will be due Mr. Cart on his contract."

---

[2] It reads in its entirety:

"ASSIGNMENT

"KNOW ALL MEN BY THESE PRESENTS:

"THAT, for and in consideration of the sum of ONE DOLLAR ($1.00) to the undersigned in hand paid by PEOPLES NATIONAL BANK of Little Rock, Arkansas, the receipt of which is hereby acknowledged, and as security for the full repayment of loans made and to be made the undersigned by the said Peoples National Bank of Little Rock, evidenced by notes executed by the undersigned to the said bank, any renewals or extensions thereof, the said undersigned Floyd D. Cart, PLASTER CONTRACTOR, does hereby transfer, assign, and deliver to the said Peoples National Bank all sums due and to become due Floyd D. Cart, Plaster Contractor under that contract executed on February 18, 1948, by and between the undersigned and LINEBARGER CONSTRUCTION COMPANY for labor on lath and plaster work on the Rivercliff Apartments, it being understood that the within assignment covers all of the funds to be disbursed subsequent to the date of this instrument by Linebarger Construction Company, Little Rock, Arkansas.

"IN WITNESS WHEREOF this instrument has been executed in Little Rock, Arkansas, this 21st day of May, 1948.

"FLOYD D. CART, PLASTER CONTRACTOR

"By: /s/ Floyd D. Cart

"Notice of the above assignment is hereby acknowledged this 21st day of May, 1948. "LINEBARGER CONSTRUCTION COMPANY

"By: /s/ R. W. Linebarger, Partner."

Armed with these papers prepared by Linebarger, Cart then approached the Bank for the first time on the matter; and Mr. Hadfield agreed to make the loans, as suggested, and wrote Linebarger:

"You will find enclosed a signed and accepted copy of the assignment of monies coming to Floyd D. Cart from your company, and we have this day advanced Mr. Cart $3,000 on the strength of same.

"Mr. Cart advises us that he will need another pay roll next Saturday. In that event we would appreciate you giving us another letter as to the approximate amount that will be coming to him on June 10 or the next pay day."

The $3,000 loan was promptly repaid on June 10th by check of Linebarger, made jointly to Cart and Peoples Bank. After the first loan, the Bank made a series of loans to Cart, in reliance on the aforementioned assignment and Linebarger's letter of estimate to the Bank prior to each such loan. Each transaction was handled and concluded as follows:

(a)—On May 28th Linebarger advised the Bank that on June 10th there would be due Cart $7,000 on his contract; the Bank made loans to Cart for $4,500; and on June 10th Linebarger issued its check to Cart and the Bank for said amount, and Cart delivered the check to the Bank in payment of the loan.

(b) On June 12th Linebarger advised the Bank that on June 15th there would be due Cart $2,500 on his contract; the Bank made a loan to Cart for that amount; and on June 15th Linebarger issued its check to Cart and the Bank for said amount, and Cart delivered the check to the Bank in payment of the loan.

(c)—On June 18th Linebarger advised the Bank that on July 15th there would be due Cart $13,000 on his contract; the Bank made loans to Cart totalling that amount; and on July 15th Linebarger issued its check to Cart and the Bank for said amount, and Cart delivered the check to the Bank in payment of the loan.

(d)—On July 16th Linebarger advised the Bank that on August 15th there would be due Cart $13,000 on his contract; the Bank made loans to Cart totalling that amount; and on August 15th Linebarger issued its check to Cart and the Bank for said amount, and Cart delivered the check to the Bank in payment of the loan.

We come now to the transaction that caused this litigation. On August 12th Linebarger advised the Bank that on September 15th there would be due Cart $16,000 on his contract; the Bank made a loan to Cart for that amount; but on September 15th Linebarger refused to issue any check, claiming—as was a fact—that Cart had defaulted in his contract, and that the difference in the total figure of the contract (that is, the difference between $62,551.70 and $50,884.30) had also come to light.[3] It developed that Cart "had too many irons in the fire": he was operating various businesses, and had lost money in them to such an extent that he became a voluntary bankrupt. The Bank proved, by evidence, that of the $16,000 loaned to Cart on the strength of Linebarger's letter of August 12th, the sum of $11,996.07 was actually used to pay Cart's payrolls on his subcontract with Linebarger.

I. *Promissory Estoppel.* The Bank, in claiming that it is entitled to judgment against Linebarger, relies on the rule of estoppel, and particularly that of promissory estoppel. The broad general principle of estoppel[4] is:

". . . he, who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden."

We have many cases recognizing and applying the rule of estoppel. Most of the old cases held that the representation must relate to a past or present situation,

---

[3] Linebarger discovered this mistake sometime earlier, but never mentioned it to the Bank.

[4] The quotation is from *Dickerson* v. *Colgrove,* 100 U. S. 578, 25 L. Ed. 618. In *Keylon* v. *Arnold,* 213 Ark. 130, 209 S. W. 2d 459, and also in *Rogers* v. *Hill,* 217 Ark. 619, 232 S. W. 2d 443, other cases are listed stating some of the principles of estoppel.

rather than to something in the future. See 19 Am. Jur. 656, "Estoppel", § 52; and see also 31 C. J. S. 289, "Estoppel", § 80. But the Arkansas Supreme Court, in an early case—*Shields* v. *Smith,* 37 Ark. 47—held that if one, by his statements as to his intended abandonment of existing rights, designedly induces another to change his condition in reliance upon such statements, then the person so stating will afterwards be estopped in his efforts to enforce his rights contrary to his declared intention to abandon them.[5]

Later, in *Conley* v. *Johnson,* 69 Ark. 513, 64 S. W. 277, a party stated his intentions and allowed another to rely thereon, and estoppel was successfully invoked. Mr. Justice WOOD quoted in the opinion from *Union Mutual Ins. Co.* v. *Mowry,* 96 U. S. 544, 24 L. Ed. 674:

"The doctrine of estoppel is applied with respect to representation of a party to prevent their operating as a fraud upon one who has been led to rely upon them . . . as to matters of fact or as to intended abandonment of existing rights."

And, again, he quoted from Bishop on Contracts:

"It is a palpable fraud for one man to entice another with promises to change his course of action and to his injury part with his effects or his services, . . ."

Again, in *Davis* v. *Shelby,* 136 Ark. 405, 206 S. W. 749, we held that when a party, by his statement of his intended abandonment of his purchase, induced another to buy the land from the vendor, then such party would be estopped to enforce his rights contrary to his declared intention of abandonment. In each of the foregoing cases the estoppel was based on the representation of a future matter, as distinguished from the representation of a past or present event.[6]

---

[5] *Shields* v. *Smith* was cited in *American Surety Co.* v. *Ballman,* 115 Fed. 292, as one of the cases holding that a promise as to future conduct could form the basis of estoppel.

[6] In West's Arkansas Digest, "Estoppel," Key No. 85, two cases are listed as apparently holding that estoppel does not apply to representations concerning future events. These cases are *Rhodes* v. *Cissel,* 82 Ark. 367, 101 S. W. 758, and *Renner* v. *Progressive Co.,* 193 Ark. 504, 101 S. W. 2d 426. But a study of these cases shows that neither

The trend of modern cases is to extend the rule of estoppel to promissory statements, if the evidence clearly shows that the statements were made to induce action and that the promissor was culpable in some regard. Pomeroy's Equity Jurisprudence, 5th Ed., § 808b, states the holdings in this language:

"There are numerous cases in which an estoppel has been predicated on promises or assurances as to future conduct. Thus an estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise be relied upon and in fact it was relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or result in other injustice. The name 'promissory estoppel', has been adopted as indicating that the basis of the doctrine is not so much one of contract, with a substitute for consideration, as an application of the general principle of estoppel to certain situations."

To the same effect see 19 Am. Jur. 657, "Estoppel", § 53, and 31 C. J. S. 289, "Estoppel", § 80. See, also, Annotation on "Promissory Estoppel" in 115 A. L. R. 152 which lists and discusses many cases which have applied estoppel to promises.

The following are only a few of the many recent cases recognizing the development of the law of promissory estoppel, which development is an attempt by the courts to keep remedies abreast of increased moral consciousness of honesty and fair representations in all business dealings: *Brewer* v. *Universal Credit Co.*, 191 Miss. 183, 192 So. 902; *Lacy* v. *Wozencraft* (Okla. 1940), 105 Pac. 2d 781; *Thom* v. *Thom*, 208 Minn. 461, 294 N. W. 461; *May* v. *City of Kearney*, 145 Neb. 475, 17 N. W. 2d 448; *In re* Jamison's Estate (Mo. 1947), 202 S. W. 2d 879; *Goodman* v. *Dicker*, 83 App. D. C. 353, 169 Fed. 2d 684; *Klein* v. *Farmer*, 85 Cal. App. 545, 194 Pac. 2d 106; *Swift* v. *Peterson*, 240 Ia. 715, 37 N. W. 2d 258; and *Waugh* v. *Lennard*, 69 Ariz. 214, 211 Pac. 2d 806.

case directly concerned the matter of promissory estoppel. In *Rhodes* v. *Cissel*, the opinion says of Cissel: "He was not misled or influenced by Rhodes to take any course of conduct, and Rhodes is not estopped." In *Renner* v. *Progressive Co.*, the Court said: "It is not estoppel, however, but fraud upon which appellant relies."

In applying the rule of promissory estoppel to the case at bar, we only need to list a few of the salient acts, representations, and omissions by Linebarger:

(a)—Linebarger initiated a course of dealings with the Bank so that Linebarger's subcontractor, Cart, might meet his weekly payroll and thereby benefit Linebarger.

(b)—Linebarger stated to the Bank: "You will be taking no chances, however, on that; I will have an assignment drawn in my office of the contract in favor of your bank; I will give you a letter each month telling you how much money he will have coming to him from the next estimate so you will know how much money to lend him."

(c)—Over a period of months Linebarger gave letters of estimate to the Bank as to the amount Linebarger would owe Cart on future dates, and each one of these letters proved accurate; and Linebarger issued its check, in accordance therewith, up to the transaction involved in this litigation. In short, by its dealings and conduct, Linebarger led the Bank to believe that checks would be issued in accordance with Linebarger's letters.[7]

(d)—Then, on August 12th, at a time when Linebarger knew that Cart's total contract was not $62,551.70 but only $50,884.30, and when Linebarger knew that Cart was not properly performing the subcontract and was neglecting the work, Linebarger wrote the Bank that on September 15th Linebarger would owe Cart $16,000.

[7] On the witness stand, Mr. Linebarger was asked and gave answer: "Q. The point I am getting at, Mr. Linebarger, to be perfectly frank, is, you had a letter out here addressed to Peoples National Bank, dated August 12, 1948, in which you told the bank that between September first and fifteenth he would have approximately sixteen thousand dollars coming to him under his contract with your company. Now I just want you to state to the Court frankly, in your own way, whether you felt you discharged the obligation you had toward the bank in view of that letter you wrote them, or failed to discharge it by putting them on notice not to lend him any more money after that, when you knew he wasn't doing the work. A. Mr. Fulk, in my mind I had no obligation to the bank, and still I don't believe I have any obligation to the bank."

The rule of promissory estoppel is at variance with Mr. Linebarger's answer. He did owe an obligation to the bank: the obligation of fulfilling his representations.

Under the rule of promissory estoppel, and in view of all the course of dealings, we hold (a) that Linebarger's letter of August 12th was a representation by Linebarger that on September 15th it would issue its check to the Bank and Cart for any amount—up to $16,000.00—that the Bank might advance to Cart to meet his payroll; (b) that the Bank was justified in relying on Linebarger's representations and in advancing Cart money, of which $11,996.07 actually went to meet the payroll of Cart in the Linebarger construction; and (c) that Linebarger is now estopped from denying the promissory representations contained in the letter of August 12th.[8]

II. *The Amount the Bank Is Entitled to Recover.* With the rule of promissory estoppel thus applied, we come to the amount that the Bank is entitled to recover from Linebarger; and we find this amount to be $11,996.07 and interest. If special circumstances had not indicated a particular purpose for use of the money, then the estoppel might well have extended to the full amount stated in the representation; but the dealings between Linebarger and the Bank, as already shown, designated the particular purpose for which the Bank was to advance the money to Cart—*i. e.,* the meeting of payrolls. In relying on Linebarger's representations, the Bank was not free to let Cart have the money for general purposes, but only for the special purpose of paying his laborers. Since only $11,996.07 went to meet Cart's payrolls on the Linebarger job, the Bank, in asking a court of equity to give it relief on the basis of promissory estoppel, is likewise estopped to claim any amount greater than what actually went into the Linebarger job—this in view of the particular course

---

[8] In *Citizens National Bank* v. *Ross Construction Co.,* 146 Tex. 236, 206 S. W. 2d 593, the Supreme Court of Texas held the rule of promissory estoppel inapplicable in a situation in which a bank had advanced $13,000 to a subcontractor in reliance on the general contractor's acceptance of an assignment by the subcontractor. But in the Texas case there were not present the controlling facts found here, *i. e.,* (a) initiation of the credit by the general contractor; (b) regularly sending of letters containing estimates of amounts to be due at future dates; (c) course of dealings on which general contractor allowed bank to rely; and (d) knowledge of the general contractor as to mistake of total amount to be paid subcontractor.

of dealings in this case. A reasonable construction of relationships is that Linebarger represented to the Bank that on designated dates Linebarger would supply estimates of the amounts Cart would be entitled to receive for work actually performed on the building, the benefits of which were received by Linebarger. Since a preponderance of the evidence shows that Linebarger profited to the extent of $11,996.07 of the estimates so made, and upon which estimate the Bank relied, Linebarger will be estopped to deny the values accruing at appellant's cost.

Therefore, the decree of the Chancery Court is reversed and the cause is remanded, with directions to enter a decree in favor of the Bank, and against Linebarger, for the said sum of $11,996.07, with interest from September 15th, 1948, until paid, and together with all costs.

GEORGE ROSE SMITH, J., not participating.