**Louise VIGODA, d/b/a Tower Associates, Petitioner,**

v.

**DENVER URBAN RENEWAL AUTHORITY, and Alex Holland, Sterling Kahn, Marian Hurwitz, Omar Blair, V. P. Cline, Thomas J. Gargan, John W. Hall, Mary Baca, Robert J. Holton, J. B. Jobe and Walter Emery, as the Board of Commissioners of the Denver Urban Renewal Authority, Respondents.**

No. 80SC293.

Supreme Court of Colorado,
En Banc.

June 7, 1982.

Rehearing Denied June 28, 1982.

George L. Vamos, Denver, for petitioner.

Conover, McClearn, Heppenstall & Kearns, P. C., Frederic K. Conover, Michael S. McCarthy, Denver, for respondents.

ROVIRA, Justice.

Louise Vigoda, d/b/a Tower Associates (Vigoda), petitioned for certiorari to review the judgment of the court of appeals, *Vigoda v. Denver Urban Renewal Authority,* Colo.App., 624 P.2d 895 (1980), affirming in part and reversing in part the district court's granting of a summary judgment in favor of Denver Urban Renewal Authority (DURA).

The petitioner sought certiorari on the grounds that in affirming the judgment of dismissal of a claim for relief based on promissory estoppel, and in the issuance of

directions to the trial court on remand of a civil rights claim based on 42 U.S.C. § 1983 (1976), the court of appeals erred. We agree.

I.

During the summer of 1977, DURA issued a Prospectus soliciting proposals for the purchase and rehabilitation of the Daniels and Fisher Tower (Tower) located within the Skyline Urban Renewal Project. The Prospectus stated that a developer would be required to submit an "Offer to Negotiate," the form and content of which was prepared by DURA, by September 15, 1977; that within thirty days following the submittal of offers DURA would select one developer who would have exclusive negotiation rights for a period of ninety days; that DURA reserved the right to extend the negotiation period at any time; and that the selected developer would make a good faith deposit of $7,268 and make appropriate studies. It also required the selected developer to submit preliminary design plans within the first sixty days of the negotiation period.

The Offer to Negotiate required the developer to negotiate with DURA for ninety days after DURA's acceptance of the Offer for the redevelopment of the Tower, and the Offer would be irrevocable for ninety days prior to DURA's acceptance "or upon such earlier date as the Authority [DURA] may reject this offer in writing."

As required by the Prospectus, Vigoda submitted her Offer to Negotiate on September 15, 1977, in the form prescribed by DURA, together with her proposal for restoration of the Tower. On December 1, 1977, DURA accepted and executed the Offer to Negotiate.[1]

Shortly after negotiations commenced, Vigoda became aware of plans which DURA had for construction of a hotel on land immediately adjacent to the Tower. She expressed views critical of this development to DURA, the press, and other per-

---

1. Although the Prospectus stated that DURA intended to select one developer with whom exclusive negotiations would be conducted within thirty days following the submittal of offers, DURA did not accept the Offer to Negotiate until December 1, 1977.

sons who were concerned about the preservation and rehabilitation of the Tower. As a result, DURA received numerous letters from public officials, including the Attorney General and the Governor.

In January 1978, DURA sent Vigoda a copy of a proposed Agreement for Sale of Land for Redevelopment. Further, negotiations concerning terms and the project completion date commenced. The parties did not come to an agreement at that time, and a subsequent meeting was scheduled between Vigoda and the DURA commissioners on February 9, 1978, for the express purpose of arriving at a mutually agreeable date for the completion of the rehabilitation of the Tower.

At that meeting, the commissioners refused to discuss the project completion date, and several of the DURA commissioners were critical of Vigoda's public airing of her concerns about the hotel development on land adjacent to the Tower and her efforts to get support from government officials. The commissioners told Vigoda to cease her "agitation" and set March 9, 1978, as the day they would further consider the sale and redevelopment of the Tower. Vigoda was instructed to submit firm evidence of financing and feasibility of the project by that date.

On March 8, DURA cancelled the March 9 meeting. Subsequently, on March 16, DURA unilaterally adopted a resolution terminating the relationship between it and Vigoda and returned her deposit.

During the period between December 1, 1977, and March 16, 1978, Vigoda spent substantial sums for plans and studies. She claims that DURA's refusal to negotiate and unilateral termination of the negotiation process rendered these expenditures valueless.

Vigoda filed a complaint in the Denver District Court in which she asserted claims for breach of contract, promissory estoppel, outrageous conduct, and violation of her First Amendment rights pursuant to 42 U.S.C. § 1983 (1976). DURA filed a Motion to Dismiss or, in the alternative, for Summary Judgment. Relying on the Prospectus, the Offer to Negotiate, resolutions of DURA, affidavits, and depositions, the trial court determined that there were no undisputed facts and concluded, as a matter of law, that the Offer to Negotiate created no more than an unenforceable agreement to agree, and that the complaint failed to state a claim for promissory estoppel or violation of constitutional rights. With regard to the claim for outrageous conduct, the court determined that DURA was a public entity, thereby causing the claim to be barred by the Colorado Governmental Immunity Act, and the facts, taken in the light most favorable to Vigoda, failed to establish a claim for outrageous conduct.

The court of appeals affirmed except as to Vigoda's claim under 42 U.S.C. § 1983 (1976). As to that claim, the appellate court concluded that the presence of disputed facts prevented the entry of summary judgment.

In her petition for certiorari, Vigoda only seeks review of two issues: first, the dismissal of her claim for promissory estoppel; second, that the test adopted by the court of appeals on the section 1983 claim improperly allocates the burden of proof to be borne by Vigoda at trial.

## II.

Holding the doctrine of promissory estoppel inapplicable, the court of appeals concluded that DURA could reject the Offer to Negotiate at any time after acceptance. It based its decision on paragraph 4b of the Offer to Negotiate. We do not agree.

Paragraph 4b provides:
"Because disposals of urban renewal project land require the prior concurrence of HUD and are contingent upon an absence of other proposals which must be solicited by publication according to state statute, this proposal shall be irrevocable for the ninety (90) day period, or upon such earlier date as the Authority may reject this offer in writing. By written agreement the parties may from time to time extend the irrevocable period of this offer."

Our reading of paragraph 4b satisfies us that it was only effective prior to DURA's acceptance of Vigoda's Offer to Negotiate. The purpose of paragraph 4b was to permit DURA a period of ninety days after the submission of the Offer to Negotiate in which to consider the Offer, obtain the concurrence of the Department of Housing and Urban Development, and comply with state statutes. During the ninety-day consideration period, paragraph 4b precluded Vigoda from revoking her Offer to Negotiate until the earlier of either the expiration of ninety days from the date of submission or DURA's rejection of the Offer in writing.

The Offer to Negotiate, when compared with the Prospectus, supports the conclusion that there were two ninety-day periods involved. The first ninety-day period related the time during which the Offer to Negotiate was irrevocable by Vigoda. The second ninety-day period is found in the Prospectus, and it commenced at the time that DURA accepted the Offer. During this period, the selected developer would have exclusive negotiation rights for ninety days.[2]

Our conclusion that two ninety-day periods were contemplated by the parties is supported by further analysis of the Offer and the Prospectus. During the ninety-day consideration period in which Vigoda was precluded from revoking her Offer, any extension required the written agreement of the parties. During the ninety-day negotiation period following DURA's acceptance of the Offer, the prospectus authorized DURA to unilaterally extend the period without the agreement of Vigoda.

■ If there were only one ninety-day period (the period of negotiation following acceptance of the Offer) and DURA expressly reserved the right to unilaterally extend such period, the requirement of a written agreement between the parties for extension of such ninety-day period as imposed by paragraph 4b would be superfluous.[3]

DURA contends that, since it did not negotiate with anyone else during the negotiation period, it therefore did not breach its promise to negotiate with Vigoda. The simple answer to this argument is that Vigoda did not allege in her complaint that DURA negotiated with third persons. Her allegation was that DURA refused to negotiate with her for ninety days, not that DURA negotiated with others.

■ DURA also suggests that an impasse developed during negotiations, and therefore "it becomes difficult, if not impossible, to define as a matter of law the obligation of the parties to meet and discuss the negotiating obstacle." The term "impasse" presupposes a reasonable effort of good faith bargaining to reach agreement. *See NLRB v. Bancroft Mfg.*, 635 F.2d 492 (5th Cir. 1981); *NLRB v. Big Three Industries, Inc.*, 497 F.2d 43 (5th Cir. 1974). Here Vigoda has alleged that DURA refused to negotiate, and such refusal constituted a clear breach of its promise to negotiate with her for ninety days. There is substantial conflict in the record as to whether there was an impasse or whether DURA refused to negotiate. This is a question of fact which precludes the resolution of such an issue on motion for summary judgment. *See Roderick v. City of Colorado Springs*, 193 Colo. 104, 563 P.2d 3 (1977); *Abrahamsen v. Mountain States Tel & Tel. Co.*, 177 Colo. 422, 494 P.2d 1287 (1972) (in considering a motion for summary judgment, all doubts must be resolved against the movant).

■ Vigoda's complaint alleges that DURA promised to negotiate with her in

2. The Prospectus provided:
   "DEVELOPER NEGOTIATIONS. The selected developer will have exclusive negotiation rights for a period of ninety (90) days. The Authority reserves the right to extend the negotiation period at any time."

3. No extrinsic evidence bearing on the resolution of any possible ambiguity was advanced

by either party in connection with the motion for summary judgment. To the extent that the Offer to Negotiate and prospectus contain ambiguous language, the ambiguities must be construed against DURA who prepared the documents. *See Christmas v. Cooley*, 158 Colo. 297, 406 P.2d 333 (1965); *Moorman Mfg. v. Rivera*, 155 Colo. 413, 395 P.2d 4 (1964).

good faith for the purpose of reaching an agreement for the redevelopment of the Tower; that DURA knew that Vigoda would devote time and make expenditures in reliance on its promise; and that the promise of DURA was relied on by Vigoda and induced her to expend time and money in furtherance of the anticipated negotiations. In our view, these allegations are sufficient to support a claim based on the doctrine of promissory estoppel.[4]

The doctrine is set out in the *Restatement (Second) of Contracts* § 90 (1981) as follows:

> "Promise Reasonably Inducing Action or Forbearance
>
> "(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

This court has not had the opportunity to consider section 90 of the Restatement. We note, however, that the doctrine set forth in this provision has been widely accepted.[5] Further, the Colorado Court of Appeals has recognized the cause of action in several recent cases. *See Shoemaker v. Mountain States Tel. & Tel. Co.*, 38 Colo.App. 321, 324, 559 P.2d 721, 723 (1976) ("Promissory estoppel is an equitable doctrine designed to create binding agreements in the interest of fairness to one detrimentally relying on the promise of another."); *Hunter v. Hayes*,

533 P.2d 952 (Colo.App.1975); *Mooney v. Craddock*, 35 Colo.App. 20, 530 P.2d 1302 (1974).

■ The purpose of promissory estoppel is to provide a remedy, under certain circumstances, to those who rely to their detriment upon promises which the promisor should have reasonably expected to induce such reliance. In the absence of a promissory estoppel cause of action, these promises would not be enforceable, generally due to a lack of consideration or a failure of the parties to reach a mutual agreement. The development of the cause of action reflects "an attempt by the courts to keep remedies abreast of increased moral consciousness of honesty and fair representations in all ... dealings." *Peoples National Bank v. Linebarger Construction Co.*, 219 Ark. 11, 17, 240 S.W.2d 12, 16 (1951).

■ We believe that the doctrine as set forth in the Restatement should be applied to prevent injustice where there has not been mutual agreement by the parties on all essential terms of a contract, but a promise was made which the promisor should reasonably have expected would induce action or forbearance, and the promise in fact induced such action or forbearance. *See Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965).

The facts as alleged by Vigoda sufficiently state a claim for relief based on the doctrine of promissory estoppel. Whether there is sufficient proof to support the allegations is still to be established.

---

4. The use of the term "promissory estoppel" has been characterized as being objectionable. *See* 1A A. Corbin, *Corbin on Contracts* § 204 (1963). The *Restatement (Second) of Contracts* § 90 (1981) has not adopted the term and instead refers to a "promise reasonably inducing action or forbearance." While we recognize that the term promissory estoppel is not entirely accurate, we use the term because of its widespread acceptance with courts and the bar. *See Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965); Comment, *Once More into the Breach: Promissory Estoppel and Traditional Damage Doctrine*, 37 *U.Chi.L.Rev.* 559 (1970).

5. *See* 1A A. Corbin, *Corbin on Contracts* §§ 193–209 (1963); 1 S. Williston, *A Treatise on the Law of Contracts* § 140 (W. Jaeger 3d ed. 1957); Boyer, *Promissory Estoppel: Principle from Precedents*, 50 *Mich.L.Rev.* 639 (1952); Boyer, *Promissory Estoppel: Requirements and Limitations of the Doctrine*, 98 *U.Pa. L.Rev.* 459 (1950); Henderson, *Promissory Estoppel and Traditional Contract Doctrine*, 78 *Yale L.J.* 343 (1969); Seavey, *Reliance upon Gratuitous Promises or Other Conduct*, 64 *Harv.L.Rev.* 913 (1951).

### III.

Vigoda's claim for relief based on 42 U.S.C. § 1983 (1976),[6] alleges that DURA and its commissioners were acting under color of state law, i.e., the Colorado Urban Renewal Law, sections 31–25–101 to –115, C.R.S.1973 (Vol. 12 & 1981 Supp.); that in exercising her right of freedom of speech she was critical of decisions made by DURA concerning land adjacent to the Tower; that DURA's refusal to negotiate with her was a result of her exercising her constitutional rights; and, as a consequence, she was damaged.

■ The court of appeals held that Vigoda's statements concerning DURA's decision on the use of adjacent property were constitutionally protected speech. With this conclusion we agree. It then set out certain standards which, if met, would establish Vigoda's claim under 42 U.S.C. § 1983 (1976).[7] With these we disagree.

The intent of section 1983 was to create a civil remedy for a person who proves that one acting under color of state law has illegally deprived him of rights guaranteed by the federal constitution or by federal law. *Espinoza v. O'Dell*, Colo., 633 P.2d 455 (1981). The burden of proof to be carried by both the plaintiff alleging illegal governmental action and the defendant, acting under color of state law, who seeks to avoid liability, was established in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and followed in *Durango School*

*District No. 9–R v. Thorpe*, Colo., 614 P.2d 880 (1980).

*Mt. Healthy* held that: (1) a plaintiff has the burden to show that his conduct was constitutionally protected and that such conduct was a substantial or motivating factor in the governmental action of which he complains; (2) if the plaintiff makes this initial showing, the defendant may avoid liability by demonstrating by a preponderance of the evidence that it would have reached the same decision even in the absence of protected conduct.[8]

■ The standards adopted by the court of appeals requiring Vigoda to establish that but for her constitutionally protected conduct she would have entered into a Redevelopment Contract with DURA and the terms of such contract do not comport with those announced in *Mt. Healthy*. They, in effect, impose on Vigoda the burden of establishing that DURA would have continued to negotiate with her and would not have terminated the negotiation process even in the absence of her exercise of constitutionally protected speech. Such a burden is not properly imposed on her. It is DURA's burden to establish that it would have taken such action even in the absence of constitutionally protected speech.

The principles established in *Mt. Healthy* and followed in *Durango School District No. 9–R* clearly outline the burdens of proof in section 1983 cases, and they should be adhered to by the trial court on remand.

---

**6.** 42 U.S.C. § 1983 (1976) provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**7.** The court of appeals held that:

"Plaintiff has a claim under 42 U.S.C. § 1983 if she can show: (1) that plaintiff's remarks were a substantial factor in DURA's decision to terminate negotiations; (2) that but for such remarks, she and DURA would have entered into a redevelopment contract; (3)

what the terms of such contract would have been; and (4) that she was damaged because the contract was not entered into."

**8.** In *Durango School District No. 9–R v. Thorpe, supra*, we approved a jury instruction that required the jury to determine:

"(1) whether constitutionally protected conduct on the respondent's part had been considered by the board of education when it decided not to renew his teaching contract; (2) whether such conduct, if considered by the board, had been a substantial or motivating factor in the non-renewal decision; and (3) whether the board of education would have voted not to renew the contract even if it had not considered constitutionally protected conduct."

IV.

DURA, in its answer brief, raises for the first time the issue of whether its alleged refusal to negotiate and termination of the negotiating process constituted actions under color of state law sufficient to subject it to claims under 42 U.S.C. § 1983 (1976). This issue was not raised in the trial court, and DURA did not file a petition or cross-petition for certiorari from the decision of the court of appeals.

C.A.R. 53(a)(3) provides that only those questions which are set forth in the petition for certiorari, or fairly comprised therein, will be considered on review. The issue now raised by DURA cannot be said to be fairly comprised within the issues raised by the petition for certiorari.

DURA acknowledges that neither the parties nor the courts below have addressed the question of whether DURA was acting under color of state law in terminating negotiations with Vigoda. Nevertheless, it argues that the "color of state law" question is jurisdictional and thus can be raised at any time.

There can be no doubt that both parties are properly within the jurisdiction of the court. Further, the courts of this state have jurisdiction to entertain and grant relief in claims based on 42 U.S.C. § 1983. *Durango School District No. R–9 v. Thorpe, supra.* Accordingly, the issue now raised by DURA should be presented to the trial court and not raised for the first time on appeal.

The decision of the court of appeals is affirmed in part and reversed in part and the case remanded for further proceedings consistent with this opinion.

LEE and QUINN, JJ., do not participate.