In re FRONTIER AIRLINES, INC., et al., Debtors.

INTERNATIONAL TRAVEL ARRANGERS, Appellant,

v.

FRONTIER AIRLINES, INC., Appellee.

No. 90–K–1081.
Bankruptcy No. 86 B 8021 E.

United States District Court,
D. Colorado.

Nov. 16, 1990.

---

David Rulon Garfield, Davis, Graham & Stubbs, Denver, Colo., Harold J. Tomin, Tomin & Anglin, Los Angeles, Cal., for Intern. Travel.

Mark A. Pottinger, H. Thomas Coghill, Coghill & Goodspeed, Denver, Colo., for Frontier.

## MEMORANDUM OPINION
## AND ORDER

KANE, Senior District Judge.

Claimant, International Travel Arrangers ("ITA"), appeals the decision of the Bankruptcy Court denying its claim for breach of contract against debtor, Frontier Airlines ("Frontier"). ITA filed its claim against the bankruptcy estate of Frontier. Jurisdiction exists according to 28 U.S.C. § 158(a). In its appeal, ITA argues: 1) ITA and Frontier had an enforceable agreement; 2) the agreement is not covered by the Statute of Frauds; 3) promissory estoppel prohibits Frontier from avoiding the transaction; 4) the trial court improperly excluded the affidavit of Harry Lehr; and 5) the trial court improperly excluded the deposition testimony of Harry Lehr. The decision of the Bankruptcy Court is affirmed in part and reversed in part. The case is remanded for further consideration of ITA's promissory estoppel argument.

## I. FACTS.

ITA is a wholesale tour company selling vacation packages. Part of the package includes air transportation which ITA secures from commercial airlines. In 1985, Harry Lehr, a vice-president of Frontier Airlines, and Stephen Russell, president of ITA, discussed the possible charter of a 165-seat MD-80 aircraft. The aircraft would be leased by Frontier and used by ITA.[1]

The following spring, Frontier needed more aircraft. Frontier sought to increase its passenger capacity but also needed to rotate existing aircraft out of service for maintenance. In April, 1986, Frontier asked ITA to relinquish the 165-seat MD-80 aircraft so that Frontier could use the plane in its fleet. On May 23, 1986, the parties terminated the charter agreement. ITA had the option to resume charters on either September 15, or December 16, 1986.

ITA argues it gave up its contractual rights to charter the aircraft in exchange for a comparable quantity of passenger space on Frontier's regularly scheduled service. ITA points to a June 9, 1986 letter which purportedly outlines an agreement between the parties. The alleged agreement guaranteed ITA 2,100 round trip seats per week at $.045-$.050 per seat mile.

ITA further alleges Frontier also agreed to designate ITA as its "national tour wholesaler" as compensation for relinquishing the plane. In support of this claim, ITA quotes internal Frontier communication and advertising material published by Frontier which describes ITA's relationship with Frontier. In addition, representatives of ITA and Frontier met with Colorado ski area officials to discuss promoting various tour packages.

Frontier argues the June 9, 1986 letter was never signed or acknowledged in writing by Frontier. Frontier claims it informed ITA president Russell that the price sought by ITA was unacceptable;

---

1. Frontier leased the craft for two years. The lease is dated September 19, 1985. Frontier and ITA completed a letter of intent covering the use of the plane on September 26, 1985. ITA began using the plane on November 25, 1985. The parties, however, did not execute a formal written charter contract until December 4, 1985.

Frontier needed at least $.05 to $.055 per seat mile. Furthermore, Frontier points out a plethora of issues left undecided which are necessary to any agreement: e.g. black out times, involvement of other wholesalers, definition of terms, cancellation fees, strikes, credit for frequent flier miles.

On August 28, 1986, Frontier filed its chapter 11 proceeding and ceased all flight operations. ITA filed its proof of claim, as amended. ITA calculates liability based on Frontier's promise to make ITA its national tour wholesaler and provide it 2100 seats per week at $.05 to $.055 per seat mile.

## II. STANDARD OF REVIEW.

ITA appeals both the factual findings and legal conclusions of the bankruptcy court. To the extent the bankruptcy court misapplied the law, ITA is entitled to *de novo* review.

Findings of fact, however, "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Bank.R. 8013. *See Schneider v. Nazar (In Re Schneider)*, 864 F.2d 683, 685 (10th Cir.1988).

## III. DISCUSSION.

### A. *Existence of a Contract.*

■ ITA maintains a contract existed between the parties. It points to the June 9, 1986 letter from ITA president Russell to Frontier vice-president Lehr. In summary, the letter provided

1. The letter confirmed "our agreement to cancel the lease of the Martinaire MD–80 ..."
2. "In exchange for cancellation you offered and ITA accepted, the right to serve as the exclusive, national wholesaler for Frontier Airlines."
3. Concerning the terms of ITA's new status it was "assumed" by Russell that such terms would include the following:
   a. The agreement would be effective through October 1, 1987.
   b. Frontier would retain rights of cancellation for nonperformance similar to the rights that existed under the Charter Agreement including "failure to produce agreed upon quotas ..."
   c. ITA was to be given "a comparable number of seats on scheduled service to replace the number of seats ITS had available under the lease contract at a comparable price of 4½–5 cents per seat mile including tax."

Bankruptcy Order at 2.

This letter was neither signed nor acknowledged by Frontier. In fact, Frontier quickly informed ITA it could not accept the proposed price.

During a brief conversation in a hallway on June 11, 1986, Lehr informed Russell that Frontier must charge at least 5 to 5½ cents per seat mile. In this brief exchange, Russell maintains he accepted the higher price range and agreed to the arrangement. This conversation was confirmed by a long time ITA employee, Phebe Connolly.

Lehr testified at trial through his deposition. Lehr's account is different. At least three separate times in the deposition, Lehr stated there was no agreement. The trial court believed Lehr and concluded there was no contract. Absent evidence indicating his conclusion was clearly erroneous, I will not overrule a factual finding of the trial judge.

The trial judge gave several reasons for his decision. First, the "hallway" conversation where the parties allegedly agreed was brief, and the memories of Russell and Connolly were self-serving. "The selective memory of Connolly does little for her credibility ... Russell's recall is affected by that most human of traits which is to recall events in a manner most favorable to one's position," Bankruptcy Order at 8.

As for Lehr, his likely bias was against Frontier: the party who actually benefits from his testimony. When Frontier shut down in August of 1986, Lehr was fired. Obviously "bitter" towards Frontier, Lehr signed an affidavit (not admitted into evidence) supporting ITA's claim. If at all, Lehr has a motive to remember "selectively" details harmful to Frontier. Here, his testimony supports Frontier's conclusion that no agreement existed. The trial judge

believed Lehr, and his findings will be honored here.

Second, the trial judge was impressed by Russell's caution and attention to detail. Russell was quick to memorialize business transactions. The fact that the June 11 conversation went unrecorded convinced the court Russell was still engaged in negotiations with Lehr. According to the trial court, Russell didn't want to hurt his bargaining position by agreeing too early on the higher price.

Finally, the trial judge found ambiguities in the purported agreement. The lack of a firm price is one example. But even if a $.05 to $.055 price range was sufficiently definite to form a contract, many issues remained unaddressed. For example, in late August, 1986, Frontier was close to shutting down. Frontier's Irma Ward sent ITA a proposed contract with a cancellation clause giving any purchaser the right to cancel the ITA relationship. The parties were negotiating until the end.

But the price term is not the dispositive issue here. In their briefs, both parties cite several cases discussing contracts where price is defined within a "range" of two numbers. The real issue is whether Russell, in fact, agreed to accept the proposed transaction. The trial court believed Russell was in the process of negotiation and specifically avoided accepting the Frontier counter proposal. Without Russell's agreement, there is no contract.

### B. Statute of Frauds.

■ The trial court refused ITA's claim because there was no agreement between the parties. Even if ITA and Frontier had an enforceable contract, the trial court found their agreement covered by the Statute of Frauds. Without written evidence of the agreement, Frontier properly raises the Statute of Frauds as a defense, and the contract is unenforceable.

The Statute of Frauds, Colo.Rev.Stat. § 38–10–112(1)(a) (1982 Repl.Vol.) applies to any agreement not capable of being performed within one year. See 2 A. Corbin, Corbin on Contracts, § 446 (1950). The June 9, 1986 letter states the agreement is

effective through October 1, 1987: a period of performance longer than a year. ITA correctly argues that a contract is outside the Statute of Frauds if performance is at least possible even though impractical within a year. Hodge v. Evans Fin. Corp., 823 F.2d 559, 561–562 (D.C.Cir.1987). ITA goes on to explain the "minimum 2,100 seats per week" discussed in the letter only obligated Frontier to provide at least that many seats while the contract was in existence; the same aggregate amount supplied over a shorter time would also satisfy the agreement.

The trial court rejected this tortured reading of the transaction. The agreement contemplated a continuous supply of seats over a period of time, and nothing in the record indicates Frontier could have discharged its obligation by providing over 100,000 seats in a compressed time period.

■ Next, ITA argues the contract was, in fact, subscribed by virtue of the testimony/affidavit of Lehr. Even if the Lehr affidavit was received into evidence, Lehr was not an employee of Frontier when he signed it. He did not have authority to bind Frontier. Likewise, the trial court concluded a letter by Frontier's Ms. Coyle to travel agents did not suffice because there is not enough evidence to indicate her authority to bind Frontier to a contract with ITA.

■ Finally, ITA argues it has fully performed its contractual obligations taking itself outside the Statute of Frauds. According to ITA, ITA relinquished its right to the MD–80 aircraft. Thus, Frontier cannot now claim the transaction from which it benefitted is barred by the Statute of Frauds. But ITA misses the point. By relinquishing its right to the plane, ITA did not fully perform its obligations. Instead, ITA agreed to enter into a wholly different agreement with new terms and new promises. Surrendering its rights under the charter was simply one form of consideration provided by ITA.

### C. Promissory Estoppel.

Without an express agreement and the Statute of Frauds looming as a valid de-

fense, ITA's only grounds for relief on appeal is promissory estoppel. The doctrine is set out in the Restatement (Second) of Contracts § 90(1) (1981) as follows:

Promise Reasonably Inducing Action or Forbearance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

■ The Colorado Supreme Court adopted Restatement § 90 and explained its purpose in *Vigoda v. Denver Urban Renewal Authority*, 646 P.2d 900, 905:

The purpose of promissory estoppel is to provide a remedy, under certain circumstances, to those who rely to their detriment upon promises which the promisor should have reasonably expected to induce reliance ... [T]hese promises would be unenforceable, generally due to a lack of consideration or a failure of the parties to reach a mutual agreement.

*Id.* In other words, justifiable reliance on the representations of another is grounds for relief. If Frontier promised ITA a certain number of seats and special status as its national tour wholesaler and ITA, in reasonable reliance upon the promise, gave up its rights under the charter contract, Frontier is liable for the detriment suffered by ITA.

But the Statute of Frauds issue in this case complicates automatic application of promissory estoppel; the two legal doctrines demand opposite outcomes. Courts split on the issue of whether promissory estoppel will support a claim otherwise barred by the Statute of Frauds. The question in Colorado, however, is settled. According to *Kiely v. St. Germain*, 670 P.2d 764 (Colo.1983), "The majority of jurisdictions faced with resolving a confrontation between promissory estoppel claims and Statute of Frauds defenses have adopted a more flexible, albeit more complex approach."

*Kiely*, 670 P.2d at 768. The goal is a decision which is "basically fair to all parties" *Id.*

To guide courts in deciding what is, essentially, a fairness issue, the Colorado Supreme Court adopted Restatement § 139. The section lists several factors.

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is enforceable *notwithstanding the Statute of Frauds* if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

(2) In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:

(a) the availability and adequacy of other remedies, particularly cancellation and restitution;

(b) the definite and substantial character of the action of forbearance in relation to the remedy sought;

(c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d) the reasonableness of the action or forbearance;

(e) the extent to which the action or forbearance was foreseeable by the promisor.

Restatement (Second) of Contracts, § 139 (1979) (emphasis added) *See also: Kiely*, 670, P.2d at 764 (adopted § 139).

Attempting to distinguish this case from *Kiely*, the trial court explained, "[T]here is no definitive contract here. In general, the law is that before a party can rely on the doctrine of promissory estoppel, he must show that there is a contract of definitive terms which the defaulting party has promised and failed to sign." Bankruptcy Order at 14. The trial court concludes, absent a signed agreement, the contract must be

established by clear and convincing evidence.

The trial court required proof of too many specific details about the underlying transaction for promissory estoppel to ever be useful. If the parties had reached a definitive agreement whose terms were certain, promissory estoppel would not be an issue. Courts would not speak about "promises" inducing "reliance;" they would look for evidence of a contract and a breach. If the contract was unwritten, the Statute of Frauds would ultimately resolve the question.

But *Kiely* and Restatement § 139 adopt a flexible approach to a party whose transaction is not specific enough, by its terms, to create a written or oral contract, but does not deserve the hardship of rendering his transaction unenforceable. The trial court demanded specific details ITA could not prove; such detail is not required by Restatement § 139.

■ The trial court reads Restatement § 139(c) to require that evidence of the agreement must be established by clear and convincing evidence. This reading ignores the conjunction "or" in the middle of subsection (c). Read in context, § 139(c) asks whether ITA's giving up the charter contract with Frontier "corroborates" ITA's ultimate conclusion that there is an enforceable agreement *"or"* the agreement is "otherwise" established or not established by different evidence. The more evidence of an agreement, the more likely promissory estoppel applies. Nothing in this provision, however, requires an agreement whose terms are convincingly established. This reading ignores the flexibility *Kiely* was designed to create.

Furthermore, *Kiely* would apply promissory estoppel to transactions whose terms were not definite. "[Promissory estoppel] is often appropriate when parties have not mutually agreed on all the essential terms of a proposed transaction," *Kiely*, 670 P.2d at 767. *Vigoda* even contemplated promissory estoppel as remedy in the face of a "failure of the parties to reach a mutual agreement," *Vigoda*, 646 P.2d at 905.

■ Consequently, the decision of the trial court is reversed and the case is remanded. The trial court should consider whether injustice can be avoided by the enforcement of Frontier's promise. Specifically, the trial court must consider the five factors set out in Restatement § 139(2) to determine whether promissory estoppel should apply in this case, notwithstanding the Statute of Frauds defense.

### D. Admissibility of Lehr Affidavit.

■ At trial, ITA sought admission of an affidavit of Lehr (plaintiff's exhibit 7). Frontier objected to the affidavit as hearsay. ITA then argued the affidavit was not hearsay because the contents were not offered for their truth. The Court excluded the evidence as hearsay.

On appeal, ITA raises additional grounds for the affidavit's admission. ITA now claims the affidavit is an adoptive admission under Fed.R.Evid. 801(d)(2)(A). Because ITA failed to make this argument at trial, I need not consider it as grounds to overturn the trial court, *See United States v. Immordino*, 534 F.2d 1378, 1381 (10th Cir.1976). In the absence showing plain error under Fed.R.Evid. 103(d), the objection should not be heard.

Further, ITA's argument is not persuasive. Apparently, the Lehr affidavit was shown to Frontier employees, among them, former Frontier president, Larry Martin. According to ITA, Martin failed to act "surprised" at the contents of the Lehr affidavit. ITA reads this lack of surprise as an adoptive admission. Such a reading is tenuous at best. Since ITA never raised this issue at trial, the trial judge never had the opportunity to judge whether Martin acted surprised. Regardless, Martin left Frontier in January, 1987. When he "failed to act surprised," he was no longer an employee of Frontier. As a former employee, he is not a party capable of adopting a hearsay statement under Fed.R. Evid. 801(d)(2).

### E. Designation of Lehr Deposition After Trial Concluded.

The parties dispute when the trial court closed the record refusing additional evi-

dence. ITA claims the trial court agreed to read additional deposition testimony from Lehr; ITA sought supplemental designation which Frontier opposed. The trial ended January 31, 1990. ITA sought the designation on February 13, 1990. On February 13, 1990, trial court entered an order declining ITA's designation.

■ ITA cites the Fed.R.Evid. 403 general language about accepting relevant evidence not unfairly prejudicial or causing undue delay. Frontier, on the other hand, focuses on the trial judge's discretion to re-open the evidence and consider additional material. Re-opening a matter to hear additional evidence is within the discretion of the trial court. On appeal, the trial judge's decision will not be disturbed absent an abuse of discretion. *Delano v. Kitch*, 663 F.2d 990, 1003 (10th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982).

■ The Lehr deposition was short and accessible to ITA. Several portions were designated by the parties and considered at trial. Taken with other statements by Lehr which were heard at trial, this additional testimony is cumulative and would not change the trial court's conclusion that the parties didn't agree on price.

CONCLUSION.

The decision of the Bankruptcy Court is affirmed in part and reversed in part. The case is remanded to the Bankruptcy Court for consideration of ITA's promissory estoppel argument consistent with this opinion.