CLYDE M. EMPSON, APPELLEE, v. DEUEL COUNTY STATE BANK ET AL., APPELLANTS.

279 N. W. 293

FILED APRIL 26, 1938. No. 30318.

*Francis P. Matthews. William P. Kelley* and *L. O. Pfeiffer,* for appellants.

*Beatty, Maupin, Murphy & Derry, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

PAINE, J.

This is an action in equity against the Deuel County State Bank and its stockholders and the Reconstruction Finance Corporation, hereinafter styled R. F. C., and the department of banking of the state of Nebraska, and its superintendent, wherein the plaintiff sought a decree declaring that he was entitled, upon the retirement of preferred stock in said bank, to have issued to him common stock in the amount of 50 per cent. of the preferred stock so retired, and plaintiff prayed that the defendants be enjoined from issuing said stock upon any other basis.

The court found that the plaintiff was entitled to the issuance of such common stock upon the retirement of the preferred stock under an oral agreement made at the time the preferred stock was issued, and that the defendants had actual knowledge thereof and bought their stock sub-

ject to the rights of the plaintiff under said agreement, and enjoined the defendants from issuing the new common stock upon any other basis. Defendants gave a supersedeas bond in the sum of $1,000, and appealed from said decree.

The decree of the district court found that the R. F. C. and the department of banking of the state of Nebraska and its superintendent were neither necessary nor proper parties, and dismissed them as defendants.

The defendants assign as errors that the decree and findings are contrary to law and contrary to the evidence; that the court erred in not sustaining the motion of defendants objecting to the taking of any evidence, near the commencement of the trial, on the ground that the petition fails to state a cause of action, and on the ground that there is a defect of parties defendant; that the court erred in not sustaining the motion made when the plaintiff rested his case, in which defendants moved that the action be dismissed against each of them for the reason that the evidence was insufficient to sustain the allegations of the petition. As these grounds for reversal rest so largely on the question of the sufficiency of the evidence, it will be necessary to make a statement of the facts in the case.

The Deuel County State Bank, of Chappell, had a capital stock of $25,000, divided into 250 shares of common stock, and on or about March 4, 1933, the said bank, with all other banks in the United States, was closed by presidential proclamation. At that time J. W. Rogers and the plaintiff owned the entire capital stock of the bank. After the bank holiday the said bank was only permitted to operate on a restricted basis, for its capital had been impaired, and it continued so to operate until August 8, 1934. Rogers and Empson immediately started to work to remove the restrictions and to restore any impairment, and to strengthen the capital of the bank by securing an R. F. C. loan. While these negotiations were in progress, and before the plans could be carried out, Mr. Rogers was accidentally killed. Rogers and the plaintiff were personally liable to the city of Chappell upon a bond to secure a municipal deposit, and

Rogers had either indorsed, or was maker on, a note of $3,400 which Empson had given to an Omaha bank, and the Rogers estate desired to be free from the liability thereof, and thereupon the plaintiff acquired all of the Rogers stock in the said bank and assumed all liability to the city of Chappell, and the Omaha bank thereupon withdrew the claim it had filed against the estate of Rogers. These statements are disputed by the defendants, who claim that the Rogers stock certificates were never assigned to Empson, but were just surrendered by order of the court as worthless. But, at any rate, the certificates were delivered by the administrator to the possession of Empson, who turned them in for cancelation. In the statement of facts in relation to the ownership of the stock of the bank, no special mention will be made of the fact that at times some officers carried a small portion of their stock in the names of their wives.

The plaintiff, in continuing his efforts to strengthen the capital of the bank, interested Ben B. McNair, then residing north of Grand Island, at St. Libory. After McNair became interested in the proposition, it was agreed between the plaintiff and McNair that plaintiff would own 50 per cent. of the capital stock and McNair would own 50 per cent. of the capital stock.

To enable the bank to remove the restrictions placed thereon by the state banking department, it was finally agreed that $20,000 should be borrowed from the R. F. C. and put into the capital structure of the bank, and on January 3, 1934, an application therefor was made to the R. F. C. This loan was granted, but, because of the double liability attached to ownership of stock in Nebraska state banks, the R. F. C. required that the preferred stock issued to secure such loans should be issued to individual stockholders, who in turn would give their individual notes to the R. F. C. and put up the preferred stock standing in their names as collateral security therefor with the R. F. C.

In accordance with this arrangement, Ben B. McNair was issued $10,000 of preferred stock and the plaintiff was

given $10,000 of preferred stock, and each put up with the R. F. C. their personal notes and, as security therefor, their shares of preferred stock. It was also required by the state banking department that slow assets of a face value of about $32,000 should be eliminated from the reported assets of the bank, and that an additional $10,000 be put up in cash instead of such slow assets. Mr. McNair thereupon contributed his one-half, or $5,000 in cash, of such additional requirement, but the plaintiff found himself unable to raise but $2,000 of his $5,000, and he therefore secured three of his friends, to wit, John R. Wertz, A. R. Todenhoft, and H. R. Isenberger, to each loan him $1,000 in cash to make the $5,000 that the plaintiff was required to put in. The evidence does not disclose that Empson gave any notes for such money, but he had a certificate for five shares of stock issued in the name of each of these three individuals, out of the stock which Empson had owned, but such certificates were not delivered, receipted for, nor taken out of the stock book at the time of their issuance, and there is some doubt whether they knew the certificates had been issued to them until some time afterwards. Each testified that they did not want bank stock, but expected Empson to pay back their $1,000 as soon as he could.

When this arrangement was completed, and the bank was reorganized to carry it out, the plaintiff had 100 shares of preferred stock and 10 shares of common stock, and Ben B. McNair had 100 shares of preferred stock and 25 shares of common stock, and Empson's three friends had five shares apiece. Empson and McNair had each secured $10,000 in cash from the R. F. C., and each had raised an additional $5,000 to eliminate slow assets of $32,000 from the bank, and Empson, in addition, had waived his rights, as the sole remaining stockholder in the old bank, to all recoveries which might be made upon the $32,000 of assets eliminated.

For many years there had been a competing bank in Chappell, to wit, the Chappell State Bank, which bank failed and was taken over by the department of banking.

Chester A. Peterson testified that on October 2, 1934, Paul Martin, representing the stockholders of the Chappell State Bank, approached Ben B. McNair with reference to buying out Mr. McNair's stock in the Deuel County State Bank.

In February, 1935, McNair went to see Todenhoft at Sterling, Colorado, and wanted to buy Todenhoft's certificate for five shares. It appears that up to that time Todenhoft did not know that any such certificate had been issued. Shortly thereafter McNair made another trip to Sterling, taking the stock certificate which Empson had made out in Todenhoft's name, and Todenhoft was paid $800 by McNair for this certificate, and signed a receipt for the original certificate which he then assigned. The plaintiff claims that McNair had in this deal taken advantage of him, and that he protested that McNair had violated their agreement by thus securing more than a 50 per cent. interest in the bank. McNair admitted that Todenhoft had told him that Empson had the right to acquire this stock, and McNair offered to sell Empson his stock in the bank, but Empson was not in a financial position to buy, and made out the new certificate for McNair, thus giving him a majority of the stock in the bank.

Chester A. Peterson, representing the stockholders in the closed bank, had entered into a written contract with McNair to purchase his control of the Deuel County State Bank, and had paid $1,000 down. These new purchasers had, through McNair, secretly examined the assets of the bank in the nighttime, unknown to Empson, and on May 11, 1935, the new stockholders, with their attorney, L. O. Pfeiffer, came into the bank and announced that they owned the control thereof through the purchase of McNair's stock. They inquired whether Empson would sell his ten shares of stock in the bank, and he told them that he could not afford to sell because he had $40,000 invested in the bank, and explained to them the agreement with McNair that as the shares of preferred stock should be retired he should be issued 100 shares of common stock.

When the new stockholders with their attorney examined

the stock book, a list of the stockholders was attached to the front of the stock book, which list is exhibit No. 7 in the bill of exceptions, and lists the stockholders of the bank, omitting their addresses, as follows:

| Name | No. of shares owned | Paid-up capital represented |
|---|---|---|
| Ben B. McNair | 120 | $12,000.00 |
| E. E. McNair | 10 | 1,000.00 |
| John R. Wertz | 5 | 500.00 |
| H. R. Isenberger | 5 | 500.00 |
| C. M. Empson | 110 | 11,000.00 |
| | | $25,000.00 |

On that same morning, Frank O. Carlson had attempted to purchase the five shares of stock belonging to Wertz, and shortly thereafter Wertz and Isenberger sold their certificates of five shares each to the new stockholders for $2,500.

New officers and directors were elected. The plaintiff was elected vice-president of the bank, the other offices being filled by the new stockholders who had bought out McNair's stock. Empson continued as vice-president, and in December Chester A. Peterson, the cashier, showed Empson a letter he had written to the banking department, asking permission to retire a portion of the preferred stock and to issue common stock to be prorated among the present common stockholders in accordance with their common stock holdings, and not in accordance with Empson's agreement, to which Empson objected. Empson had discovered certain irregularities in the note pouch, being notes purporting to have been signed by the cashier's minor brother, aggregating several thousand dollars, and also excessive loans to the cashier's father, and other irregularities, and he protested these matters directly to the cashier, who invited Empson to ride home in his car on the night of December 31, 1936, and upon arriving at the home he told him he was discharged and would be replaced the next day

by the young son of Frank O. Carlson, the president of the bank.

On March 29, 1937, the plaintiff filed the petition in the case at bar.

On many of the points the evidence of the plaintiff and the defendants is in sharp conflict, but the trial court in its decree found that it was orally agreed and distinctly understood by the parties at the time of the issuance of the new stock that Clyde M. Empson would, upon the retirement of the preferred stock, receive 100 shares of common stock, and Ben B. McNair should receive the same amount, in lieu of the preferred stock they each owned, and it was further agreed by and between the parties that Wertz, Todenhoft and Isenberger were not to receive, as dividends or otherwise, any additional stock; that the individual defendants herein, at the time of purchasing their stock, each and all had full, actual, and constructive knowledge and notice of said agreement, and took their stock subject to the rights of the plaintiff therein; that said agreement is a valid, binding agreement, and one that the plaintiff is entitled to have enforced. In the opinion of this court, these findings of the trial court are fully supported by the evidence in the case.

A number of propositions of law appear in the briefs, but we have given so much space to the statement of the evidence that, while we have examined them, we will not be able to discuss all of them in this opinion.

A stockholder in a corporation is entitled to relief in equity for specific performance of an agreement with other stockholders for equalizing their stock.

The defendants insist that the directors of a corporation have no legal right to discriminate between stockholders; that all are entitled to share equally in the distribution of dividends, which should go to the record owners of the stock when such dividends are declared. The law well supports each of these propositions. However, it is also the law that a purchaser of corporate stock, with notice of latent equities between the prior parties, or with notice of facts sufficient to put him on inquiry, takes the title thereto subject to such equities.

This rule is discussed in 12 Fletcher, Cyclopedia Corporations (Perm. ed.) 274, sec. 5479, under the heading, "Who are *bona fide* purchasers for value and without notice," and states: "In order that a purchaser of stock may acquire a title free from secret liens in favor of the corporation, or latent equities between prior parties, he must be in the position of a *bona fide* purchaser for value. He takes subject to such liens or equities if he has notice of them at the time of his purchase, or notice of facts sufficient to put him on inquiry, or if he is not a purchaser of the stock for value."

In the case of *Tecumseh Nat. Bank v. Russell*, 50 Neb. 277, 69 N. W. 763, Commissioner Irvine stated that, while Bush claimed to be a purchaser for value without notice, he failed to establish the fact by the proof. In the case at bar, there can be no doubt that the defendants had actual notice of Empson's claims. His evidence is clear and positive; it is supported by many exhibits; the denials of the defendants are not convincing.

Equity will examine the whole transaction, looking through corporate forms to protect the rights of innocent parties, for "Equity seeks the real and substantial rights of the parties, and applies the remedy in such manner as to relieve those having the controlling equities." *National Mortgage Loan Co. v. Hurst*, 120 Neb. 37, 231 N. W. 519.

And again, the case of *Fenton v. Tri-State Land Co.*, 89 Neb. 479, 131 N. W. 1038, where Judge Letton said that it is an old and well-established principle that "Equity looks at the substance of things rather than the form, and will endeavor to carry out the real intent and purpose of the parties to a contract."

The evidence is convincing that Wertz, Isenberger, and Todenhoft, who advanced $1,000 apiece to help Empson, were not to participate in any common stock issued in the retirement of the 100 shares of preferred stock purchased by Empson with his $10,000 note.

"The general rule that the transferee of stock is entitled to all dividends declared after the transfer, and the trans-

feror to all those declared before the transfer, may be changed by the terms of the transfer or agreement of the parties, where that is the intention of the parties." 11 Fletcher, Cyclopedia Corporations (Perm. ed.) 937, sec. 5381.

Corporate dividends may be made the subject of a valid contract in like manner and to the same extent as other personal property. *Bank of Waverly v. Daily*, 103 Neb. 7, 170 N. W. 183; *Cook v. Monroe*, 45 Neb. 349, 63 N. W. 800; *Platte County Independent Telephone Co. v. Leigh Independent Telephone Co.*, 80 Neb. 46, 116 N. W. 511; *Latson v. Buck*, 87 Neb. 16, 126 N. W. 760.

The oral contract was not within the statute of frauds merely because it might not have been performed within a year.

The record discloses that the two owners of this bank, Empson and McNair, were willing to go to any sacrifice to give the community a going bank, running without any restrictions. They first borrowed and put into its assets $10,000 apiece from the R. F. C.; they next each raised and put in $5,000 cash to enable the bank to take out of its assets $32,000 of slow paper. These were not assessments, but voluntary acts on their part. When better days came, and the bank was making money sufficient to retire a portion of the preferred stock, it is clear that it should be retired on the terms and in the manner agreed to by the stockholders at the time the money was invested to save the bank.

We find no prejudicial error in the record, and the decree of the lower court is

AFFIRMED.