WILLIAM C. BIGGER, APPELLANT, V. FREMONT NATIONAL BANK & TRUST COMPANY, A UNITED STATES CORPORATION, APPELLEE.

340 N.W.2d 142

Filed November 10, 1983.   No. 82-265.

Craig A. Knickrehm of Nelson & Harding, for appellant.

Lawrence H. Yost of Yost, Schafersman, Yost, Lamme & Hillis, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ., and GRANT, D.J.

WHITE, J.

This is an appeal from an order of the District Court for Dodge County, Nebraska, on appellee's motion for summary judgment. The trial court in its order found that there was no genuine issue as to any material fact and that the appellee was entitled to a judgment as a matter of law. We reverse and remand the cause for a trial on the merits.

Appellant, William C. Bigger (Bigger), filed his petition against appellee, Fremont National Bank & Trust Company (Fremont National), seeking to recover the sum of $42,928.56, interest, and costs. At the outset we wish to point out and emphasize that the main theory of recovery by the appellant, as clearly demonstrated by the allegations of his petition, was based upon the doctrine of promissory estoppel, and, although it is true that the action involved a check purportedly drawn upon the account of one of the bank's customers and payable to the appellant, the action itself was not brought upon the instrument itself but, rather, upon an alleged subsequent promise made by the bank to Bigger and his

depository bank in Illinois. We summarize the material facts.

Bigger is a farmer and cattle feeder operating a farm located in Biggsville, Illinois. Since 1972, and approximately four times per year, Bigger purchased cattle from Fremont Cattle Company (Fremont Cattle), which was Bigger's primary source of cattle. The dealings between the parties were not unusual until, on March 4, 1980, the normal course of dealing was reversed, and for the first time Bigger sold Fremont Cattle 101 calves and received a check from Fremont Cattle for $42,928.56. The check was signed by Keith Mumma (Mumma). Apparently because he had been dealing with Mumma for so many years, Bigger took no precautions to make sure the check was good before he released his cattle, nor did he make any investigation into the financial standing of Fremont Cattle. He understood that Mumma was a partner of Vance Willard (Willard), who operated Fremont Cattle and who maintained a business checking account at Fremont National. Bigger testified that Mumma had frequently referred to Willard as "his partner." The fact is, however, that Vance Willard, doing business as Fremont Cattle Company, was a sole proprietorship engaged in the cattle order business.

Upon receiving the check Bigger immediately deposited the check in his account at the Bank of Oquawka, Illinois. The check was returned to the Bank of Oquawka 2 weeks later, on March 18, 1980. On that day Bigger and Kenneth Smith, the head cashier of the Bank of Oquawka, telephoned Fremont National. Bigger and Smith simultaneously participated in this conference. A sticker on the returned check indicated that it had been returned because it bore an unauthorized signature (Mumma's signature). A female employee in the bookkeeping department informed them that that was the reason it had been returned. She also informed them that there were funds in the account sufficient to cover

the check. Then, according to Bigger's testimony, "She said well, I'll tell you what; you send the check back through, and I'll get ahold of Keith or Mr. Willard and we'll get it taken care of and it will be all right." Kenneth Smith supported Bigger's testimony that the Fremont National employee told them to redeposit the check and that the check would be honored. In his deposition Smith testified as follows: "Q So you talked to somebody. And what did you say to them when they got on the phone? A Well, I asked her what the score was, and she assured us to send it back through and it would be taken care of. . . . Q Well, how was the decision arrived at to send the check back? A Well, she assured us to send it back. Q She told you to send it back? A Um-hmm. Q So you did? A (Nods head.) Q And that's all you remember about the call—she told you to send it back? A Yes, and it would be taken care of. Q And that it would be taken care of? A Um-hmm."

As suggested by the bank, Bigger then sent the check through again. The check was returned a second time, approximately 2 weeks later. A note from Fremont National attached to the check indicated that it was returned unpaid for the reason "See-maker-replaced with another ck." Shortly after the return of the check the second time, Bigger was informed that Fremont Cattle was in a Chapter 11 bankruptcy. There is no indication in the record as to when the petition in bankruptcy was filed.

Bigger then filed his petition against Fremont National, the crux of his claim being that the bank's representations to him should have been reasonably expected to and actually did induce forbearance by Bigger as to any legal rights which were available against Willard, doing business as Fremont Cattle Company, prior to the petition in bankruptcy by Willard.

It is not the purpose of a summary judgment proceeding to determine how a case should be decided

but, rather, whether there are any controverted material questions of fact involved which require a trial on the merits. Summary judgment is not appropriate, even where there are no conflicting evidentiary facts, if the ultimate inferences to be drawn from those facts are not clear. *Metro. Tech. Community College v. South Omaha Industrial Park*, 207 Neb. 472, 299 N.W.2d 535 (1980).

Our investigation and analysis of this case, therefore, must focus upon the question of whether there were any material fact questions which should have been submitted at trial upon the merits before a jury or the court acting as the trier of facts.

Fremont National's principal defense is based upon the assumption that this action is brought on the check itself. Relying on Neb. U.C.C. §§ 3-409 and 3-410(1) (Reissue 1980), they contend that a check does not of itself operate as an assignment of any part of the funds in the hands of the drawee available for its payment, and the bank is not liable to the holder unless and until it accepts or certifies the check. They further contend that an acceptance must be in writing.

In his brief, appellant acknowledges the correctness of the above rules but points out that there exist a number of separate bases of liability of a bank which arise apart from the instrument itself, including the doctrine of promissory estoppel. Section 3-409(2) provides: "Nothing in this section shall affect any liability in contract, tort or otherwise arising from any letter of credit or other obligation or *representation* which is not an acceptance." (Emphasis supplied.) Comment 2 to § 3-409 of the Uniform Commercial Code provides in part that "[t]he drawee is not liable on the instrument until he accepts; but he remains subject to any other liability to the holder." Comment 3 to this section of the Uniform Commercial Code provides: "Subsection (2) is new. It is intended to make it clear that this section does not in any way affect any liability which

may arise apart from the instrument itself. The drawee who fails to accept may be liable to the drawer or to the holder for breach of the terms of a letter of credit or any other agreement by which he is obligated to accept. He may be liable in tort or upon any other basis because of his representation that he has accepted, *or that he intends to accept*. The section leaves unaffected any liability of any kind apart from the instrument." (Emphasis supplied.)

Neb. U.C.C. § 1-103 (Reissue 1980) provides: "Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principle [sic] and agent, *estoppel, fraud, misrepresentation*, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (Emphasis supplied.)

In *Valentine Production Credit Assn. v. Spencer Foods, Inc.*, 196 Neb. 119, 241 N.W.2d 541 (1976), we held that where the pleadings and record present material questions such as payment, estoppel, fraud, and delay, all as contemplated by § 1-103, summary judgment is not available. Also, in *North Valley Bank v. National Bank of Austin*, 437 F. Supp. 70 (N.D. Ill. 1977), the court found that the plaintiff had stated a cause of action where a letter of credit had been issued to the plaintiff, which letter required presentment by a date certain. The plaintiff did make demand for payment pursuant to the letter of credit prior to the expiration date, and plaintiff telephoned defendant to determine if plaintiff's demand had been received and whether or not the draft was in order. Plaintiff stated that defendant advised plaintiff that the correspondence had been received from the plaintiff and that the draft was not technically correct, but that the defendant would honor it. The court held that § 1-103 of the U.C.C. does make the principles of waiver and estoppel ap-

plicable to transactions falling under the U.C.C. Section 1-103 of the Illinois Uniform Commercial Code is identical to § 1-103 of the Nebraska Uniform Commercial Code.

The petition clearly states a cause of action which, if proved to the satisfaction of a trier of fact, would entitle the appellant to relief.

A review of the record reveals that there are numerous disputed questions of fact. Both in its pleadings and by the testimony of its witnesses, Fremont National denies almost every material allegation contained in Bigger's petition.

Since we conclude that a summary judgment should not have been granted, we need not decide whether the pleadings in this case were sufficiently broad to encompass the issue of whether or not Fremont National complied with its midnight deadline as provided in Neb. U.C.C. § 4-302 (Reissue 1980). Suffice it to say, if there are any deficiencies that should be corrected or any other issues which should be explored on a retrial, there will be an opportunity to do so by appropriate amendment to the pleadings.

REVERSED AND REMANDED.

BOSLAUGH, J., dissenting.

To the extent that the opinion of the court implies that the plaintiff may recover against the bank on a theory of contract or promissory estoppel based upon a conversation with an unidentified female employee in the bookkeeping department of the bank, I respectfully dissent.

"The usual assistants in a bank—tellers, bookkeepers, and others—act under special or express authority, and their acts bind their bank only when they are within the line of authority." 9 C.J.S. *Banks and Banking* § 211 at 461 (1938). There is no allegation of special or express authority in the petition, and no facts are alleged which would permit a finding of presumed authority to bind the bank.

I do not agree that the petition filed in this case

clearly stated a cause of action which, if proved, would entitle the plaintiff to relief.

HASTINGS, J., joins in this dissent.