RALPH P. ROSNICK AND CENTRAL STATES TOOL AND DIE WORKS, INC., A NEBRASKA CORPORATION, APPELLANTS, V. RICHARD J. DINSMORE, APPELLEE.

457 N.W.2d 793

Filed July 13, 1990.   No. 88-302.

Clarence E. Mock, of Johnson and Mock, for appellants.

John R. Douglas, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

This is an appeal from an order of the district court for Douglas County granting summary judgment to defendant-appellee, Richard J. Dinsmore, in a legal malpractice action instituted by plaintiffs-appellants, Ralph P. Rosnick and Central States Tool and Die Works, Inc. We reverse the order granting summary judgment against Rosnick and remand the cause for further proceedings in accordance with this opinion. We affirm the order of summary judgment against Central States.

This malpractice action is predicated upon circumstances which caused Ralph Rosnick and Central States, the corporation of which Rosnick was sole shareholder and president, to request attorney Ephraim L. Marks to bring suit against Carl Renstrom for Renstrom's failure to fulfill promises

to provide financing to Central States. Marks filed a petition against Renstrom in May 1978. In July 1980, Marks withdrew from the case, and different counsel appeared. In August 1980, the suit was dismissed for failure to comply with an order of the court. See *Rosnick v. Renstrom*, 210 Neb. 759, 316 N.W.2d 765 (1982). Rosnick and Central States alleged that on or before October 30, 1980, they retained the defendant-appellee, Dinsmore, to bring suit against Marks and his law firm for legal malpractice. The petition against Dinsmore alleges that Dinsmore was negligent in not properly pursuing the claim. On August 25, 1982, Rosnick and Central States, through a different attorney, brought an action against Marks for malpractice. The action against Marks was subsequently held to be barred by the statute of limitations. See *Rosnick v. Marks*, 218 Neb. 499, 357 N.W.2d 186 (1984). On November 1, 1982, Rosnick and Central States filed a petition initiating this action against Dinsmore. On April 29, 1987, an amended petition against Dinsmore was filed.

Dinsmore's answer to Rosnick and Central States' amended petition set out many defenses. Dinsmore denied that he agreed to sue Marks, denied any negligence on his part or the part of Marks, alleged that the negligence of still another attorney was an intervening cause of the damage, and alleged that the underlying action by Rosnick and Central States would have failed as a matter of law, regardless of any negligence by Marks. On October 13, 1987, Dinsmore filed a motion for summary judgment, alleging that the suit brought against Renstrom would have failed as matter of law for the following reasons:

1. The plaintiff Ralph P. Rosnick as a stockholder or officer of Central States Tool & Die Works, Inc., a Nebraska corporation, had no cause of action under any legal theory for the alleged failure of defendant Renstrom to furnish financial assistance and additional capital to the corporate plaintiff.

2. That an accord and satisfaction of claims between Rosnick and Renstrom concerning Central States Tool & Die Works, Inc., occurred when they entered the agreement dated November 5, 1976 . . . which agreement is in satisfaction of certain claims by Renstrom and the

release of Rosnick of certain claims. Nowhere in the agreement does Rosnick attempt to preserve his purported rights against Renstrom which were the subject matter of the lawsuit filed . . . on May 9, 1978.

3. Any purported oral agreement to provide unspecified financial support over an indefinite period is, as a matter of law, too vague and indefinite to be enforceable.

4. Any purported oral agreement to provide unspecified financial support over an indefinite period greater than one year is barred by the statute of frauds.

5. Central States filed Chapter XI bankruptcy on or about September 9, 1975 and the plan was confirmed on August 12, 1977. In none of the bankruptcy documents did Central States list its alleged rights against Renstrom as an asset and the Court's Order confirming the plan makes no mention of the alleged assets. That because of the conduct of Central States during the bankruptcy proceeding it is judicially estopped from asserting any cause of action against Renstrom in 1978 based upon any alleged agreement to furnish assets or credits to Central States.

6. The Order of the United States Bankruptcy Court confirming Central States' plan is in effect a judgment that Central States has no claim against Renstrom and is barred under the doctrines of res judicata and collateral estoppel.

As reflected in the judgment order, the parties stipulated at the hearing on the motion for summary judgment that "the sole issue presented on the motion for summary judgment is the validity of the plaintiffs' underlying claim of plaintiffs [sic] against Carl Renstrom . . . ." The trial court determined that the initial suit against Renstrom would have failed as a matter of law.

Rosnick and Central States timely appealed from this judgment and assign error to the district court's determinations that there remained no genuine issue as to a material fact relating to Rosnick and Central States' original action against Renstrom and that Renstrom would have been entitled to

judgment as a matter of law in that case.

The case, filed in 1982, presents to this court a single issue requiring a difficult analysis in 1990 of a case which allegedly was negligently handled by attorney Marks in 1978, to determine if that case could ever have been successfully presented. The myriad of other defenses set out in Dinsmore's answer are not before us. If this case is to be decided by determining the efficacy of each of those defenses one at a time, the length of the legendary case of Jarndyce and Jarndyce in Charles Dickens' "Bleak House" may be approached right here in Nebraska. Be that as it may, the single issue before us must be decided.

As we stated in *John v. OO (Infinity) S Development Co.*, 234 Neb. 190, 191-92, 450 N.W.2d 199, 201 (1990):

A party defendant is entitled to summary judgment if the pleadings, depositions, and admissions on file, together with affidavits, show there is no genuine issue as to any material fact or as to the ultimate inferences which may be drawn from the material facts, and the moving party is entitled to judgment as a matter of law. Neb. Rev. Stat. § 25-1332 (Reissue 1985); *Wicker v. City of Ord*, 233 Neb. 705, 447 N.W.2d 628 (1989). Further, as we stated in *Babb v. United Food & Commercial Workers Local 271*, 233 Neb. 826, 830, 448 N.W.2d 168, 170 (1989), "[i]n appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence."

The record, considered in the light most favorable to Rosnick and Central States, shows the following: In 1948, Rosnick started Central States as a tool-and-die shop serving other manufacturers. Rosnick incorporated Central States in 1969 and became its sole shareholder and president. By 1971, Central States manufactured its own line of recreational equipment for a number of major accounts, including Montgomery Ward & Co. of Chicago (Wards). During 1972, Rosnick sought capital to fund an expansion of Central States' production. Rosnick negotiated a financial arrangement with

More America, a Cedar Rapids, Iowa, investment group. Rosnick agreed with a representative of More America that More America would initially provide $300,000 in exchange for an "option to pick up" 30 percent of Central States' stock. More America would also be given the chance to obtain an option for up to 49 percent of Central States' stock, based upon a price of $100,000 for each additional 10 percent of the stock.

In the latter part of 1972, before the board of More America was able to approve the agreement, Rosnick had a conversation with his former employer, Carl Renstrom, who had "started [him] in the business." Renstrom called Rosnick because he heard Rosnick had "big things going." Renstrom met with Rosnick and offered to finance the expansion of Central States. Rosnick outlined the proposed plan of expansion, gave Renstrom "the figures," informed Renstrom that Central States was in the process of obtaining a Small Business Administration loan, and informed Renstrom that Rosnick had provided $135,000 of his own money as additional funds for Central States. Renstrom inquired as to how much additional capital Central States needed right away, and Rosnick responded that Central States needed an additional $300,000 right away. Rosnick testified in his deposition that Renstrom responded, "I've got it, I'll put it in with an option to acquire forty-nine percent of the stock five years from [now] on the basis that we . . . go public after five years."

Rosnick discussed his options with a representative from Wards. The Wards representative then contacted Renstrom and discussed the arrangement with Renstrom. Based upon the Wards representative's recommendation, Rosnick decided to obtain the funding from Renstrom instead of More America.

Renstrom provided Central States with $200,000 in November 1972 and another $100,000 in December 1972. Rosnick stated that he and Renstrom agreed that Renstrom "would have the opportunity to exercise an option on thirty percent of the stock at any time that he would desire and in no event later than five years when they would go public." Renstrom also would provide more capital to Central States as needed and apparently could obtain an option for up to 49 percent of the stock. There is no evidence in the record explicitly

stating the price to be paid for the stock under Renstrom's option. A permissible inference from the negotiations with More America and Renstrom is that the exercise of the option was a formality and that the price for at least 30 percent of the stock was to be considered already paid. In addition to the stock option, Rosnick agreed to provide Renstrom with voting proxies to all the shares of Central States stock. According to Rosnick, the capital furnished by Renstrom was supposed to be "equity capital."

Notwithstanding Rosnick's perception of the agreement, when Renstrom's attorney drew up the documents to evidence the agreement in 1973, the $300,000 was characterized as a loan. Renstrom's business manager requested Rosnick to sign a promissory note on behalf of Central States, to sign a personal guaranty of the note, to give as security his stock in another company which owned the building in which Central States operated, and to sign an irrevocable voting proxy for all of the Central States stock. After consulting with his then attorney, Rosnick acquiesced and entered into the modified agreement. Thereafter, Renstrom installed various business managers to oversee Central States' operation, and Rosnick's responsibilities were limited to the manufacturing aspect of the business.

Apparently, the oral understanding between Rosnick and Renstrom still included a promise by Renstrom to continue to provide financing to Central States as needed and a promise by Rosnick that Renstrom could thereby obtain an option on up to 49 percent of the Central States stock. This agreement is partially evidenced by a letter to the Small Business Administration signed by Renstrom and dated November 24, 1972. In the letter, Renstrom stated, "I have already invested, in the way of a loan, $200,000 and am prepared to go up to a half million, and further, if necessary, to bring this business [Central States] to an ultimate success." The agreement to finance is also evidenced by the pledge agreement, which contemplated further advances, and the irrevocable proxy, which was to continue in force so long as any debt from Central States to Renstrom remained.

By mid-1973 approximately 40 to 45 percent of Central

States' business was with Wards. Wards was interested in expanding its business with Central States. At a meeting in Chicago between Rosnick and Wards representatives, Wards proposed a plan of expansion for Central States which would result in increased sales to Wards at a rate of $1 1/2 to $2 million per year for a period of 7 years. The plan included the development of new products and an expansion of sales to a national market, including expanded sales to customers other than Wards.

Rosnick returned to Omaha and met with Renstrom and Renstrom's business manager. Renstrom agreed to furnish the $1 million that would be necessary within the first year of the expansion. Rosnick, along with Renstrom's business manager, returned to Chicago to discuss the details of the plan of expansion. On July 25, 1973, Rosnick, Renstrom, the business manager, and a representative from Wards met at Renstrom's home in Omaha to discuss the expansion plan and financing. Rosnick told Renstrom that Central States could operate on its own cash-flow during the next 6 months while the expansion was implemented, but that Central States would require Renstrom to supply $500,000 by the end of the year and that an additional $500,000 would be required another 6 months after that. If the cash-flow did not catch up by that time, another capital infusion would become necessary. Renstrom agreed to provide the funding according to the plan. Although it was seemingly inconsistent with Rosnick's earlier statements, Rosnick testified that at this point Renstrom already had the option to "pick up" 49 percent of the Central States stock and would realize huge profits when the expanded company went public.

In the following months Central States hired new employees, completed prototypes, and entered into agreements to sell millions of dollars worth of product to Wards and others. In early 1974, Central States was in need of additional capital, and Renstrom's business manager and the company controller made requests to Renstrom to put in the first $500,000. Renstrom stated that he would put in the first $500,000, but the money was not forthcoming. In response to further requests from the business managers, controllers, and Rosnick,

Renstrom continued to reassure them that the money was forthcoming. In the meantime all the company cash was used to pay operating expenses, and Rosnick contributed additional personal funds to maintain the company. In March 1974, apparently Central States was not able to meet its production obligations, and Wards threatened to cancel many of its orders. In a letter dated March 22, 1974, Renstrom wrote to Wards confirming that he had promised to financially support Central States and assuring Wards that he had recently made arrangements with his bankers to provide the financial support that Central States required to promptly fill Wards' orders.

The funds were still not forthcoming. Wards canceled its orders for the new products, and Central States was unable to overcome its cash-flow problems. As creditors began to exercise their remedies in June 1974, Renstrom put control of Central States back in Rosnick. In the latter part of 1974, Renstrom told Rosnick that Rosnick was going to have to make it on his own and that Renstrom was not going to put any more money into Central States. Rosnick contends that he contributed a total of $156,192 of his personal funds to Central States to support the company during the time Renstrom was reassuring him that he would come through with the promised funds.

From the record it appears that Central States filed for rearrangement under chapter 11 of the Bankruptcy Act on September 9, 1975. Central States did not list on its asset schedules any claim against Renstrom. Specifically, in response to the schedule's command to list "Contingent and unliquidated claims of every nature," Central States replied, "None." Renstrom filed an amended claim against Central States for $1.1 million, based upon promissory notes and interest thereon. The basis for the amount of this claim is not in the record. We note that the amount of Renstrom's bankruptcy claim against Central States indicates that Renstrom made significant additional advances or incurred other significant obligations on Central States' behalf beyond the $300,000 contribution described by Rosnick. There are vague references in the record that Renstrom guaranteed various lines of credit used by Central States. Rosnick testified that Renstrom's claim

was negotiated down to $330,000, but the claims register does not reflect such a reduction. According to the claims register, none of the $1.1-million amended claim was disallowed, and 20 percent of the amended claim was to be paid under the plan.

On November 5, 1976, Renstrom and Rosnick entered into an agreement to facilitate adoption of Central States' rearrangement plan. In exchange for Rosnick's stock in the company that owned the building in which Central States operated (which was all the outstanding stock of that company) and Rosnick's payment to Renstrom of $75,000 at a rate of $1,000 per month, Renstrom agreed to vote for approval of Central States' chapter 11 rearrangement plan, to deem satisfied Rosnick's personal guaranties of Central States' debts to Renstrom, and to cancel Rosnick's irrevocable proxy of Central States stock held by Renstrom. The agreement made no reference to a release of any claims Rosnick had against Renstrom. The rearrangement plan was confirmed on August 12, 1977. The record does not show any subsequent proceedings in the bankruptcy court, but Rosnick's testimony indicated that some debts remained under the rearrangement plan when Central States was "closed" in 1985.

On August 31, 1978, Rosnick and Renstrom agreed to modify certain obligations created by the November 5, 1976, agreement. The August 31, 1978, agreement included an undertaking by Rosnick and Renstrom not to use the November 5, 1976, agreement to "in any way, promote, impair or otherwise affect the course of The Litigation [the action by Rosnick and Central States against Renstrom as reflected in the May 1978 petition filed by Marks]."

Based upon the above facts, the issue is whether a jury could reasonably find that Renstrom's promises to provide funds to Central States created a legal liability to Rosnick or Central States which was enforceable in the action brought by attorney Marks in the state district court. As suggested by Dinsmore's motion for summary judgment, any claim by Rosnick must be separate from the claim of Central States and implicate damages separate from the damages accruing to Central States. We will consider Rosnick's action first.

In considering Rosnick's action against Renstrom based

upon a theory of promissory estoppel, we find that there remain genuine issues as to material facts and that Renstrom would not have been entitled to judgment as a matter of law. In *Yankton Prod. Credit Assn. v. Larsen*, 219 Neb. 610, 365 N.W.2d 430 (1985), this court applied the rule of law stated in the Restatement (Second) of Contracts § 90 at 242 (1981), which provides:

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

We have applied the same theory in other cases. See, *Gilbert Central Corp. v. Overland Nat. Bank*, 232 Neb. 778, 442 N.W.2d 372 (1989); *Bigger v. Fremont Nat. Bank*, 215 Neb. 580, 340 N.W.2d 142 (1983); *Farmland Service Coop, Inc. v. Klein*, 196 Neb. 538, 244 N.W.2d 86 (1976); *Leach v. Treber*, 164 Neb. 419, 82 N.W.2d 544 (1957).

A jury could reasonably find that Renstrom should have expected Rosnick to rely on Renstrom's promise to provide $1 million to finance the expansion plan as agreed July 25, 1973, and that Renstrom should have foreseen that his reassurances might cause Rosnick to try to support the company in the short term. In view of Rosnick and Renstrom's prior course of dealing and other circumstances, a jury could also reasonably find that some part or all of Rosnick's personal contributions to Central States while awaiting Renstrom's performance were made in reasonable reliance upon Renstrom's reassurances. Finally, a jury could reasonably determine that justice requires that Renstrom pay Rosnick the amount that Rosnick was damaged by reasonably relying on Renstrom's promise and reassurances.

Dinsmore argues that application of promissory estoppel only provides a substitute for consideration and is not an independent cause of action. Dinsmore concludes that to recover under the Restatement, *supra*, all the elements to contract formation, apart from consideration, must be present, including an offer with reasonably definite terms. Dinsmore

asserts that none of Renstrom's promises were sufficiently definite to give rise to an enforceable contract.

First, the promise relied upon by Rosnick was not indefinite. Renstrom promised to contribute $1 million to Central States during 1974. By January 1974, $500,000 was to be paid, and the additional $500,000 was to be paid in June 1974. Second, there is no requirement of "definiteness" in an action based upon promissory estoppel. See, *Bixler v. First Nat. Bank of Oregon*, 49 Or. App. 195, 619 P.2d 895 (1980); *Southwest Water Services, Inc. v. Cope*, 531 S.W.2d 873 (Tex. App. 1975); *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 133 N.W.2d 267 (1965); but see, *Gillum v. Republic Health Corp.*, 778 S.W.2d 558 (Tex. App. 1989); *Forstmann v. Culp*, 648 F. Supp. 1379 (M.D.N.C. 1986). Promissory estoppel only requires that reliance be reasonable and foreseeable. As stated in *Hoffman, supra*, the doctrine of promissory estoppel "does not impose the requirement that the promise giving rise to the cause of action must be so comprehensive in scope as to meet the requirements of an offer that would ripen into a contract if accepted by the promisee." *Id.* at 698, 133 N.W.2d at 275. The reason for the distinction between the contract requirement of reasonable definiteness and the promissory estoppel requirement of reasonable and foreseeable reliance is the nature of the remedy available. Promissory estoppel only provides for damages as justice requires and does not attempt to provide the plaintiff damages based upon the benefit of the bargain. The usual measure of damages under a theory of promissory estoppel is the loss incurred by the promisee in reasonable reliance on the promise, or "reliance damages." Reliance damages are relatively easy to determine, whereas the determination of "expectation" or "benefit of the bargain" damages available in a contract action requires more detailed proof of the terms of the contract. The reasonableness of Rosnick's reliance on this promise and subsequent reassurances is an issue for a jury to determine.

In Dinsmore's argument that Rosnick cannot demonstrate a right to relief under a theory of promissory estoppel, Dinsmore relies in part on *Farmland Service Coop, Inc. v. Klein*, 196 Neb. 538, 244 N.W.2d 86 (1976). In determining that promissory

estoppel could not be used to circumvent the protection provided by the statute of frauds, we stated in *Farmland, supra* at 544-45, 244 N.W.2d at 90:

Traditionally, the promissory estoppel claim has been used to supply the element of consideration where to refuse enforcement of a promise unsupported by a consideration would work an injustice to the party who relied to his detriment on the promise. . . .

. . . [W]e determine section 90 of Restatement, Contracts 2d, Tent. Dr. No. 2 (1965), is limited in scope to informal contracts of a unilateral nature and its purpose in such instances is to dispense with the requirements of consideration to support the promise where it applies.

The transaction in *Farmland* was a grain sale for over $500, the enforcement of which was held to be barred by the statute of frauds. In that transaction a promise to sell was given as consideration for a promise to buy, and absent the statute of frauds a binding contract would have arisen. The rule in *Farmland* is designed to prevent circumvention of the statute of frauds through an action based upon promissory estoppel.

In *Farmland*, the court specifically stated that promissory estoppel "gives rise to a cause of action for damages." *Id.* at 544, 244 N.W.2d at 90. The *Farmland* requirement is met in this case, because Renstrom did not bargain for Rosnick's contributions to Central States. Under the facts seen most favorably to Rosnick, Renstrom bargained for Central States' expansion so that he could realize profits on his option to possess Central States stock. Renstrom's promise, as far as Rosnick was concerned, was unilateral in nature, in that it was not given in exchange for a promise from Rosnick. (At that time Renstrom controlled Central States.) Rosnick is not circumventing the statute of frauds because he never personally contracted with Renstrom in the first place. Moreover, the statute of frauds would not apply to the promises made to Central States in July 1973 which were performable within a year. See, *Maseberg v. Mercer*, 176 Neb. 668, 127 N.W.2d 208 (1964) (enforcement of contract is not barred by statute if performed by one side within a year); *Empson v. Deuel County State Bank*, 134 Neb. 597, 279 N.W. 293 (1938) (contract is not

within the statute of frauds merely because it might not be performed within a year).

As stated in *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 695, 133 N.W.2d 267, 273 (1965), "the development of the law of promissory estoppel 'is an attempt by the courts to keep remedies abreast of increased moral consciousness of honesty and fair representations in all business dealings' " (quoting *Peoples National Bank of Little Rock v. Linebarger Construction Company*, 219 Ark. 11, 240 S.W.2d 12 (1951)). This is not a case where the plaintiff is attempting to use promissory estoppel to circumvent the statute of frauds or as a means of placing liability on a defendant after the breakdown of good-faith contract negotiations. This is a case where a jury could find that justice requires compensation for reliance damages reasonably and foreseeably induced by promises made and broken in a business setting.

We also disagree with Dinsmore's contention that Rosnick released Renstrom from any liability on this claim in the November 5, 1976, agreement. Renstrom agreed, in exchange for considerations from Rosnick, not to raise the November 5, 1976, "release" as a defense in the litigation of the claim against Renstrom, and at any rate, the release related to the guaranties and was a release of Renstrom's claims against Rosnick, not vice versa.

The reliance damages to Rosnick created by his contributions to support Central States while waiting for Renstrom's performance was personal to Rosnick and did not accrue to Central States. We therefore hold that the trial court erred in finding that there remained no genuine issues as to material facts in Rosnick's promissory estoppel action against Renstrom and that Rosnick's action would have failed as a matter of law.

Other considerations control the disposition of Central States' claim. Dinsmore contends that the terms of the contract are too indefinite to be enforceable as a matter of law, that the statute of frauds would have barred the action as a matter of law, and that failure to disclose the claim in Central States' bankruptcy bars the action under the doctrines of res judicata and judicial estoppel. We conclude that the initial action by

Central States against Renstrom would have failed as a matter of law, because Central States did not have standing to bring the claim.

Without determining whether Renstrom was legally liable to Central States as a result of his alleged breach of contract, we determine that Central States was not the appropriate party to bring suit against Renstrom in the state district court. The bankruptcy of Central States was governed by the Bankruptcy Act. The Bankruptcy Code did not become generally effective until October 1, 1979, and cases commenced prior to that date are governed by the Bankruptcy Act. See Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, §§ 402 and 403, 92 Stat. 2549, 2682-83. See, also, *Stein v. United Artists Corp.*, 691 F.2d 885 (9th Cir. 1982). The rearrangement plan, filed September 7, 1976, refers to specific provisions of the Bankruptcy Act. Under the Bankruptcy Act, any claim not "dealt with" in the plan remained dormant in the estate under the control of the bankruptcy court, rather than reverting to the debtor. See *Pako Corp. v. Citytrust*, 109 Bankr. 368 (D. Minn. 1989) (citing *Stein, supra*). In *Stein, supra*, Fred Stein was the assignee of an antitrust claim initially accruing to Century Cinema Circuit, Inc. Century filed for rearrangement under chapter 11 of the Bankruptcy Act and did not list the claim among its assets in the proceeding. In *Stein*, the court interpreted "[f]ormer section 70(i) of the Bankruptcy Act, 11 U.S.C. § 110(i) (1976)," 691 F.2d at 890, which stated that upon confirmation of the rearrangement, "the title to the property dealt with shall revest in the bankrupt or debtor . . . ." See *Pako, supra* (comparing 11 U.S.C. § 1141(b) (1988) of the Bankruptcy Code, which subsection provides that confirmation of the plan revests "*all* of the property of the estate in the debtor" (emphasis supplied), with the Bankruptcy Act provision above). The court in *Stein* determined that only property "dealt with" in the chapter 11 plan revested in the debtor and that any property not specifically "dealt with" in the plan remained dormant in the bankruptcy estate. Consequently, the court held that under chapter 11 of the Bankruptcy Act,

> [t]he proper procedure to enforce any newly discovered asset neither listed nor abandoned by the debtor in

possession is to petition the bankruptcy court to reopen the proceedings under Rule 515 to permit the court to decide whether reopening is desirable and, if so, whether the claim is to be administered for the benefit of creditors or abandoned. If the claim is to be enforced for the estate, a trustee will be appointed for its enforcement.

691 F.2d at 893.

*Stein* declares that the issue of how undisclosed assets are pursued after the completion of chapter 11 rearrangements was one of first impression. However, the court based its determination on an analogy to the "well-established" line of cases dealing with the issue in chapter 10 bankruptcies. *Id.* at 890. Although *Stein* was decided after Central States hired Marks to pursue its claim against Renstrom, we determine that the law as interpreted by *Stein* applies to the status of Central States' claim against Renstrom. As far as the record shows, Central States' claim against Renstrom accrued prior to the confirmation of the chapter 11 rearrangement, was undisclosed, was not specifically abandoned, and was not dealt with in the rearrangement plan. The rearrangement plan specifically retained in the bankruptcy court jurisdiction over "[t]he collection of sums due Central States, which sums constitute assets of Central States' estate or money due the debtor-in-possession . . . ." The claim against Renstrom could only have been brought in the state court by a trustee appointed by the bankruptcy court. The record does not show that Central States was acting as appointed trustee of the bankruptcy court in the action against Renstrom. Central States did not have title to this claim against Renstrom and did not have the authority to bring an action against Renstrom on the claim in state court. Consequently, Central States' action against Renstrom in the state district court would have failed as a matter of law.

Central States' amended petition in this action against Dinsmore specifically alleges that Marks was hired to prosecute Central States' claim against Renstrom in the state district court and that Marks was negligent in several aspects of the prosecution of that claim. Central States could not have been damaged by this alleged negligence by Marks, because Central States did not have title to the claim. Central States' amended

petition against Dinsmore makes no further allegations of negligence by Marks. Therefore, no genuine issue of material fact remains, and Dinsmore is entitled to judgment against Central States as a matter of law.

The summary judgment against Rosnick is reversed, and the cause is remanded for further proceedings in accordance with this opinion. The summary judgment against Central States is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.