# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1762NE

_____

| | | |
|---|---|---|
| American Shizuki Corporation, | * | |
| | * | |
| Appellant, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the District of |
| International Business Machines | * | Nebraska. |
| Corporation, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 12, 2001

Filed: May 29, 2001

_____

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges, and KORNMANN,[1] District Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.

American Shizuki Corporation (ASC) appeals from the District Court's[2] order granting International Business Machines (IBM) summary judgment in this diversity

_____

[1]The Hon. Charles B. Kornmann, United States District Judge for the District of South Dakota, sitting by designation.

[2]The Hon. Joseph F. Bataillon, United States District Judge for the District of Nebraska.

case claiming promissory estoppel, negligent misrepresentation, and fraudulent misrepresentation. We affirm.

I.

In 1988 IBM began negotiating with several companies, including ASC, for the manufacture of plastic film capacitors to be used by IBM in its mainframe computers. On September 2, 1988, IBM and ASC entered into a Standard Ordering Agreement which set forth the basic contractual terms and conditions for "future purchase by IBM" of component parts manufactured by ASC. The agreement specifically stated that it did not obligate IBM to purchase any items from ASC, and that future Purchase Orders "shall be [ASC]'s only authorization to manufacture Items." Moreover, the agreement provided that neither it nor any subsequent purchase agreement or purchase order "shall impair IBM's right to . . . procure from others . . . Items which, now or in the future, may be competitive with those offered by [ASC]."

By letter dated February 1, 1989, IBM conveyed to ASC "the possibility of IBM purchasing 15,000,000 Plastic Capacitors per two consecutive twelve (12) month periods." The letter went on to state: "This quantity is a forecast only, and represents no commitment by IBM to purchase these quantities during or after this time period." ASC communicated to IBM that it wanted greater assurances from IBM before ASC made the estimated capital expenditure of $2.1 million for the equipment it would need to manufacture the capacitors. IBM sent ASC another letter dated February 22, 1989, expressing IBM's "intent to order" from ASC 30 million capacitors, made to IBM's drawings, over a minimum period of two years, contingent upon the condition "[t]hat IBM's requirements for these capacitors continue."

In the Spring of 1989, ASC spent approximately $2.6 million to purchase the equipment for manufacturing the plastic capacitors. By letter dated December 6, 1991, IBM asked ASC to add a second manufacturing shift to meet IBM's anticipated demand

-2-

for plastic capacitors in 1992. On December 18, 1991, IBM sent ASC a Letter of Intent to confirm IBM's intention of ordering approximately 18 million plastic capacitors in 1992, which was more than ASC's existing manufacturing capacity. The letter projected that IBM would require 35-50 million capacitors in each of 1993 and in 1994. ASC, however, could not justify setting up a second production shift based on IBM's actual purchases to date, and never added a second shift. From 1990 to March 1994, IBM purchased a total of 14,344,000 capacitors from ASC. The need for plastic capacitors dissipated with the advent of new technology and the development of ceramic capacitors. In June 1997, IBM informed ASC that it would no longer purchase plastic capacitors from ASC.

ASC filed this diversity action against IBM in June 1997, seeking $8.5 million in damages under three theories of relief: promissory estoppel, negligent misrepresentation, and fraudulent misrepresentation. The District Court granted IBM's motion for summary judgment, and this appeal followed.

II.

"We review a grant of summary judgment de novo and apply the same standard as that applied by the District Court." Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir. 2000). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We also review de novo the District Court's application of state law, predicting how the highest court in the forum state would resolve the issues. Clark, 205 F.3d at 1082.

Nebraska follows the Restatement of Contracts (Second) § 90 with regard to promissory estoppel. Yankton Prod. Credit Assn. v. Larsen, 365 N.W.2d 430, 433 (Neb. 1985). The Restatement provides that a "promise which the promisor should

reasonably expect to induce action . . . on the part of the promisee . . . and which does induce such action . . . is binding if injustice can be avoided only by enforcement of the promise."

As the District Court noted, two key officers of ASC testified by deposition that IBM made no oral or written promises that it would either purchase a specified quantity of the plastic capacitors or that ASC would recover the costs of its capital expenditures. These individuals also testified that they understood that all purchases of capacitors by IBM would be made through purchase orders, and that IBM never made intentionally false representations to ASC about any matter related to the capacitor project. We believe this evidence, especially in light of the cautionary language in the Standard Ordering Agreement and the conditional language of the February 1989 letters from IBM quoted above, defeats ASC's claims.

The only representations by IBM that might support ASC's claims are those in IBM's December 18, 1991, Letter of Intent. As noted above, however, ASC did not take any action in reliance upon this letter. ASC never added the second production line that IBM requested. Thus the element of detrimental reliance upon a promise or misrepresentation, an element common to all three of ASC's theories of recovery, is lacking. See Cao v. Nguyen, 607 N.W.2d 528, 532 (Neb. 2000) (reliance is an element of both fraudulent and negligent misrepresentation).

Accordingly, we affirm.

KORNMANN, District Judge, dissenting.

With all due respect, I would reverse for a jury to determine what I believe are material issues of fact. I agree largely with the majority opinion that ASC cannot recover based solely on the letters from IBM. However, the letter of February of 1989 spoke of an intent to order 30 million capacitors "over a minimum period of two years",

-4-

this to be contingent upon IBM's requirements continuing for the items. Despite this, it was not until March of 1994 that IBM first told ASC that, because the cost of the film capacitors was greater than the price of ceramic capacitors, IBM would not be purchasing the capacitors at the levels previously stated. In 1997, IBM discontinued all purchases of the 2.5 mm capacitors. March of 1994 is, of course, outside the minimum two year window for which the commitment was made and 30 million capacitors had not been purchased. One could certainly conclude that, during the two year period, IBM made no decision as to diminished lack of need for the items. If they did come to such conclusion, the record is clear that they did not communicate it to ASC. At a minimum, factual issues of bad faith and justifiable reliance would exist with IBM waiting so long to act. I reject the claim of IBM that the "minimum period of two years" does not mean two consecutive years. Common sense tells us that ASC could not have been expected to operate the plant for one year and then shut down the manufacturing line while waiting one or more years for IBM to place more orders in some other unknown year.

The district court relied on some testimony given at depositions, calling the testimony "undisputed" to the effect that IBM made no oral or written promises that it would either purchase a specified quantity or that ASC would recover the costs of its capital expenditures. I do not believe the testimony is nearly so clear.

Former executives of ASC testified. Robert Harris claimed that IBM was making "commitments" and "initial representations that they made that never were held." He testified as to telephone calls and meetings during which IBM officials were making "representations" about how much volume there would be. He talked "numerous times" with IBM officials as to "what was coming and what we needed, inventory items, so on and so forth . . ." While he did admit that there was no promise to buy a certain number of units and the word "guarantee" was never used, he also testified that IBM wanted ASC to maintain inventory levels of the product, saying to him "something to the effect , you know, don't worry about that, we will take it, which

to me is a promise again." He testified that IBM did not "live up to their commitments." He spoke of IBM verbally expressing IBM's intentions to buy certain volumes. He spoke of numerous telephone conferences he had with IBM officials. He claims IBM "did not live up to their intentions of saying, we are going to buy so much product from you." IBM at meetings with ASC showed graphs of the volume of the product going up over the period of years.

Allen Tompkins also testified at a deposition. "IBM never held up their end of the program on the usage purchase orders that were supposed to be. The original commitments were never made." He testified he relied in part on "knowing the people we were working with." They had worked on other projects with IBM. There is evidence in the record of a course of dealing between these two companies and this is also relevant. Tompkins said he "would say there were some verbal commitments." He also testified that IBM supplied false information "concerning the number of capacitors IBM would purchase."

Other deposition testimony was presented by Ronald Anderson, a 30 year employee of ASC. He spoke of an IBM "commitment they were going to buy 30 million pieces over two years." According to Anderson, IBM "continually stated" that these were minimum quantities. These are obviously oral communications after the letters were written. He testified in answers to various questions as to commitments and what he called "firm commitments" made by IBM.

A promise is described in the Restatement of Contracts 2d, §2 (1) as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." I do not believe this can be determined in the present case as a matter of law. We are, of course, not talking about a contract here but about promissory estoppel. I fully recognize that a mere statement of opinion or prediction of future intent will not sustain an action for promissory estoppel. While a promise is certainly required, Nebraska

recognizes the distinction between actions for breach of contract in which there is a requirement of reasonable definiteness, and actions for promissory estoppel in which there is the requirement of reasonable and foreseeable reliance. Foreseeable reliance is the very nature of the remedy available. Promissory estoppel allows for damages only as justice requires and does not attempt to provide a plaintiff with damages based on the benefit of the claimed bargain. Reliance damages are relatively easy to determine, whereas the determination of "expectation" or "benefit of the bargain" damages in a contract action require more detailed proof of the terms of the contract. *See* Rosnick v. Dinsmore, 457 N.W.2d 793 (Neb. 1990), Hawkins Constr. Co. v. Reiman Corp., 511 N.W.2d 113 (Neb. 1994), and Hoffman v. Red Owl Stores, Inc., 133 N.W.2d 267 (Neb. 1965).

Having spent $2.3 million, it would seem that ASC relied on something. I believe it is for a jury to decide what the course of dealing was between IBM and ASC, what IBM said and did, when each statement was made or action taken, whether what IBM did and said and the course of dealing would have permitted ASC to reasonably have relied on such matters, and whether IBM should have foreseen such reliance by ASC.

For these reasons, I would reverse the grant of summary judgment and remand for a trial. I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.